EUGENE B. SLEAR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
SLEAR v. COMMISSIONER
Docket No. 16492-85.
United States Tax Court
T.C. Memo 1987-395; 1987 Tax Ct. Memo LEXIS 392; 54 T.C.M. (CCH) 108; T.C.M. (RIA) 87395; August 11, 1987. George A. Breschi, for the petitioner. Robert E. Williams, Jr., for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined deficiencies in petitioner's Federal income tax and additions to tax for fraud for the taxable years 1979, 1980 and 1981 as follows: Section 6653(b) [1]
Year
Deficiency
Addition to Tax
1979 [2]
$ 21,685.00
$ 10,842.50
1980
73,754.85
36,877.43
1981
23,783.62
11,891.81
After numerous concessions, the issues *394 we must decide are: (1) whether petitioner reported $ 4,890.00 received from Thomas M. Boyle, Jr. in 1979 as income on his 1980 Federal tax return; (2) whether petitioner was engaged in a trade or business in 1979, 1980 and 1981 other than as an employee of the University of Maryland Hospital; (3) whether $ 41,095.00 that petitioner received in bribes from Alan Gieseman in 1980 constitutes taxable income or a loan; (4) whether petitioner is entitled to a $ 15,000.00 bad debt deduction pursuant to section 166 for his 1979 taxable year; and (5) whether petitioner is liable for the addition to tax for fraud for 1979, 1980 and 1981. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Certain facts have been deemed admitted pursuant to Rule 90. [3]
Petitioner was uncooperative in preparing this case for trial, and counsel for petitioner repeatedly failed to return counsel for respondent's telephone calls, to appear at scheduled conferences or to reschedule conferences. Petitioner has failed to produce any records concerning his receipt of income in 1979, 1980, and 1981 or substantiation *395 of many of the deductions claimed on his 1979, 1980 and 1981 returns. Petitioner also failed to respond to respondent's interrogatories or requests for admissions. As a result, many of respondent's requests for admission were deemed admitted pursuant to Rule 90. Petitioner argued that he had tried to cooperate with respondent but because he lived in a different state than his counsel, it had taken extra time to comply with respondent's requests. Petitioner's home in Pennsylvania, however, was only approximately 60 miles from counsel's office in Maryland and the distance does not excuse petitioner's derelictions. Petitioner also argued that he was unable to provide documentation to support his claims because he had provided it to the Internal Revenue Service in he course of an audit and to the Maryland Attorney General's office in the course of the criminal investigation and trial. He admitted, however, that he could have gotten copies of many of his business records but did not do so because it would be "costly and burdensome." Respondent issued his notice of deficiency on March 4, 1985. Petitioner timely filed his petition on June 6, 1985. [4] After trial petitioner filed *396 an amended petition dated February 17, 1987 and respondent filed a second amendment to answer dated February 25, 1987. Petitioner, Eugene B. Slear, Jr., resided at Coatesville, Pennsylvania at the time his petition was filed. Until approximately July 1981, petitioner resided at Baltimore, Maryland. Petitioner is a college graduate and has taken several graduate-level business courses. Petitioner has made an effort to understand the tax laws. From approximately January 31, 1979 through April 1981, petitioner served as the Assistant Director of Financing Systems for the University of Maryland Hospital ("UMH"). Petitioner's primary assignment at UMH was to implement a comprehensive hospital management system. One of his duties was to manage the UMH Data Center. Petitioner received wages from the State of Maryland of $ 35,237.47 in 1979; $ 42,559.95 in 1980; and $ 28,230.10 in 1981. During 1980, petitioner had authority, subject to the approval of his supervisor, Robert Ginn, to approve payments to third parties for purchase orders and invoices. Petitioner was involved *397 in the approval process through which UMH purchased a computer system called a "hospital financial model" from the Hospital Data Center of Virginia through Thomas M. Boyle, Jr. in 1980. Boyle was a consultant to the Hospital Data Center of Virginia and to UMH. Petitioner had worked with Boyle on previous occasions. Boyle was also a close friend of petitioner's supervisor Ginn and had recommended petitioner for the job at UMH. Petitioner claims that he and Boyle were partners in a consulting business in 1979, 1980 and 1981. Petitioner, however, has been deemed to have admitted that he was not a partner in a partnership during the years in issue. Moreover, although Boyle did not testify at the trial in this case, in a previous criminal proceeding in which petitioner was convicted of bribery, [5] Boyle denied that he had any independent business relationship with petitioner. On February 19, 1980, petitioner opened a savings account at Mercantile Safe Deposit & Trust Co. under the name Temporary Systems Support c/o Eugene B. Slear, Jr. The account was controlled solely by petitioner. Petitioner deposited the following amounts received from Boyle in the *398 Mercantile Safe Deposit & Trust Co. savings account during the years in issue: Date
Deposit
February 20, 1980
$ 34,000.00
April 19, 1980
40,000.00
Petitioner reported these payments on his 1980 income tax return as capital gain from the sale of an asset described as "software system development." Petitioner did not acquire any such capital asset and did not sell such an asset in 1980. Petitioner also received the following payments from Boyle which were not deposited in the savings account: Date
Payment
November, 17, 1980
$ 12,500.00
January 20, 1981
6,500.00
March 19, 1981
3,500.00
Petitioner testified at one point that he received two payments of $ 6,500.00 and $ 3,500.00 from Boyle in 1981 for consulting services. He claimed that he performed work through Boyle at Anne Arundel General Hospital, Mercy Catholic Medical Center, Geriatric Medical Centers and G. O. Carlson Co. Boyle allegedly took care of billing and documentation of hours and paid petitioner after he received payment. Petitioner presented no documentary evidence and called no witnesses to confirm that he performed such work on *399 Boyle's behalf. He admitted at another point in his testimony that the two payments from Boyle in 1981 of $ 6,500.00 and $ 3,500.00 were bribes. Petitioner did not report the payments as income on is 1981 return. [6]
Petitioner also received a check from Boyle for $ 4,890.00 dated July 11, 1979. Petitioner did not report the payment as income on his 1979 return. Alan Gieseman is a friend of petitioner. Gieseman has degrees in economics and business administration and an M.B.A. in finance. In 1980, Gieseman was the Executive Director of the Maryland Resource Center. His primary charge was to develop a statewide data system. Gieseman also performed consulting work *400 through his company, James Walker and Associates. He started the company in 1980 without the knowledge of his employer because he thought he might lose his job at Maryland Resource Center as a result of changes in the Center's long range-goals and wanted to be prepared to begin a new career. Giesemen was the sole employee/owner of James Walker and Associates. In the fall of 1980, Gieseman received a $ 60,000.00 payment from a company called Pentemation for a software program and programming that were later sold to UMH. [7] Petitioner represented UMH in this transaction. In the fall of 1980, Gieseman opened a bank account under the name James Walker to receive the funds. At the time Gieseman sold the software program he did not own it. He acquired two software programs in late 1980 or early 1981 for a nominal sum. Gieseman made three payments to petitioner soon after he sold the software programs: $ 30,000.00 on October 31, 1980, $ 8,540.00 on October 30, 1980, and *401 merchandise valued at $ 2,555.00 on October 22, 1980. Petitioner and Gieseman were convicted of bribery in connection with these payments. [8] Both testified, however, that they intended the cash payments to be loans. Gieseman's testimony was evasive, and he could not positively say whether the characterization of the transfer of funds to petitioner as a loan was an afterthought. The terms of the "loan" were ambiguous. Petitioner presented a copy of a loan agreement signed by him and by Gieseman which Gieseman allegedly prepared on or around October 31, 1980. The loan agreement provides for a loan of $ 38,540.00 to be repaid with interest in six months out of the proceeds from the sale of petitioner's house in Baltimore or by refinancing through conventional sources. Petitioner also presented a second document dated April 15, 1981 extending the time for repayment until the earlier of settlement on the house in Baltimore or October 29, 1981 because petitioner had not yet sold the house. Petitioner repaid the money Gieseman had given him plus $ 7,100.00 in "interest" after he sold his house in July 1981. The signings of the loan agreement and extension *402 were not witnessed and the agreements were not recorded. Petitioner did not provide any collateral for the alleged loans. Although Gieseman testified that others knew the loan existed, none of them testified in this proceeding. Petitioner did not report the payments from Giesemen on his 1980 income tax return. Less than a month after he received the payments from Gieseman, petitioner submitted an application for a bank loan to purchase a new car. Although the application required him to list all debts, petitioner did not list the alleged loan from Gieseman. Petitioner signed the loan application below the statement "I/we affirm that each of the answers in the foregoing statements * * * of this application are true and correct * * *." Petitioner testified that the "loan" from Gieseman should have been included on the application and that he had also not listed other outstanding debts in order to get the car loan. As early as 1979, the Maryland Attorney General's Office had been investigating billing practices at UMH because the hospital had subverted normal purchasing procedures. In June 1981, petitioner learned that the investigation had expanded to include UMH's contracts *403 with Boyle and other contracts with the University. The investigation eventually reached the purchase of the "hospital financial model" computer system from Boyle and the Hospital Data Center of Virginia. The Attorney General's investigation also reached the payments Giesemen made to petitioner in 1980 soon after he received $ 60,000.00 for a software program sold to UMH through Pentemation. During the summer of 1981, while the Attorney General's investigation was continuing and after petitioner had left UMH, petitioner asked Robert O'Keefe, a UMH employee, to procure official stationary and a typing ball for him. At petitioner's request, his friend Dottie MacMurray then created certain documents, and O'Keefe attempted to place them in UMH files. O'Keefe, however, was unable to place the documents in the files because the investigation had escalated. Petitioner decided not to pursue the matter, and O'Keefe destroyed the documents. The night before her grand jury testimony, petitioner met with Dottie MacMurray, with whom he was romantically involved at the time, and told her that the documents she had created were no longer in issue and thus not relevant. On August 17, 1983, petitioner *404 was convicted in the Circuit Court for Baltimore City, Maryland of the following: (1) Violation of Md. Ann. Code art. 27, § 342 (1982) by stealing $ 36,000.00 from the State of Maryland, to wit: the University of Maryland Hospital, during the period February 14, 1980 through April 11, 1980; (2) Violation of Md. Ann. Code art. 27, § 342 (1982) by stealing $ 52,000.00 from the State of Maryland, to wit: the University of Maryland Hospital, during the period March 11, 1980 through April 15, 1980; (3) Violation of Md. Ann. Code art. 27, § 342 (1982) by stealing $ 38,564.40 from the State of Maryland, to wit: the University of Maryland Hospital, during the period October 5, 1980 through March 19, 1981; (4) Violation of Md. Ann. Code art. 27, § 23 (1982) by receiving a bribe on or about January 21, 1981, of $ 6,500.00 from Thomas M. Boyle, Jr. for the purpose of being influenced in the performance of his official duties as an employee of the State of Maryland, to wit: Assistant Director for Finance and Systems at the University of Maryland Hospital Data Center; (5) Violation of Md. Ann. Code art. 27, § 23 (1982) by receiving a bribe on or about March 19, 1981 of $ 3,500.00 *405 from Thomas M. Boyle, Jr. for the purpose of being influenced in the performance of his official duties as an employee of the State of Maryland, to wit: Assistant Director for Finance and Systems at the University of Maryland Hospital Data Center. On December 7, 1986, petitioner pled guilty and was convicted in the Circuit Court for Baltimore City, Maryland of receiving a bribe on or about October 31, 1980 of $ 30,000.00 from Alan Gieseman for the purpose of being influenced in the performance of his official duties as an employee of the State of Maryland, to wit: Assistant Director for Finance Systems at the University of Maryland Hospital Data Center. [9] In a separate proceeding, Gieseman was also convicted of bribery. Petitioner also received additional income during the years in issue which he failed to report on his income tax returns. On February 23, 1979, petitioner deposited a check for $ 11,100.00 in his personal *406 checking account. Petitioner argued that the money was in repayment of a loan, but he has been deemed to have admitted that the deposit constituted taxable income to him which he did not report on his 1979 return. [10] In 1980, petitioner received $ 900.00 in compensation from Anne Arundel General Hospital and $ 445.00 in interest income, which he concedes were not reported on his 1980 return. In late 1977 or early 1978, petitioner testified that he loaned $ 15,000.00 to James Hanley which was to be repaid in four months. Hanley had promised to provide money for college for a member of his family. Hanley did not repay the loan and at first petitioner was unable to locate him. Once he did, petitioner did not file suit against Hanley because he knew that he would be unable to collect on a judgment and because of his relationship with the family. Petitioner did not present any evidence to corroborate his testimony. In 1979, petitioner deducted the loan as a bad *407 debt. OPINION The first issue we must decide is whether petitioner reported $ 4,890.00 received from Boyle in 1979 on his 1980 income tax return. Petitioner concedes that he failed to report the payment in 1979 and, therefore, understated his income for 1979. He contends, however, that he mistakenly reported the payment in 1980 and should be allowed an offsetting deduction for that year. Petitioner bears the burden of proving his entitlement to a deduction. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). The only evidence petitioner presented to establish that he reported the payment in 1980 was his testimony and a worksheet that he claims to have used in preparing his 1980 return. The worksheet lists payments from Boyle but does not list a payment of $ 4,890.00. We find that petitioner has not met his burden of proof, and therefore, hold that he is not entitled to a deduction of $ 4,890.00 in 1980. Next we must determine whether petitioner was in a trade or business during the years in issue other than as an employee of UMH. The parties have agreed that *408 if we find that petitioner was engaged in a trade or business, petitioner will be allowed to deduct one-third of his claimed Schedule C business expenses for each of the years 1979, 1980 and 1981. Petitioner claims that in 1979, 1980 and 1981, he was in business with Boyle as a financial and data processing consultant. Section 162(a) provides a deduction for all "ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business * * *." Although "trade or business" appears in numerous sections of the Code, neither the Code nor the regulations provide a generally applicable definition of the term. To determine whether a taxpayer is carrying on a trade or business, we must examine all of the relevant facts and circumstances. Commissioner v. Groetzinger,    U.S.   , 107 S.Ct. 980, 988 (1987); Higgins v. Commissioner,312 U.S. 212, 217 (1941). In the instant case, petitioner has presented only his own testimony to meet his burden of proving that he was engaged in a trade or business. Petitioner *409 claims that he was involved in a consulting business with Boyle. Boyle allegedly did all of the billing, kept records of hours worked and paid petitioner after the clients paid him. Petitioner presented no documentary evidence to substantiate his claims and did not call Boyle or any of the clients for whom he claims that he and Boyle performed work to testify. The failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced the evidence would be unfavorable. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1168 (1946), affd. 162 F.2d 513 (10th Cir. 1947). This presumption is supported by Boyle's denial at petitioner's criminal trial in the Circuit Court for Baltimore City, Maryland that he had any independent business relationship with petitioner. We believe the alleged business was a smoke screen for petitioner's theft and bribery. We find that petitioner was not engaged in a trade or business in 1979, 1980 and 1981 other than as an employee of UMH. He *410 is, therefore, not entitled to any of the deductions claimed on Schedules C of his Federal income tax returns for 1979, 1980 and 1981. Next we must decide whether the $ 41,095.00 that petitioner received as bribes from Alan Gieseman in 1980 constitutes taxable income or a loan. Petitioner and Gieseman testified that they intended the $ 38,540.00 in cash advances to be repaid when petitioner sold his house in Baltimore. [11] The "loan" was in fact repaid out of the proceeds from the sale f petitioner's house in July 1981 with $ 7,100.00 in "interest." Respondent argues that petitioner and Gieseman did not intend for the money to be repaid at the outset, and that petitioner decided to repay Gieseman in an attempt to disguise the bribery payments as loans only after he learned of the Attorney General's investigation. For a disbursement to constitute a true loan there must have been, at the time the parties entered into the transaction, *411 an unconditional intention on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment. Haag v. Commissioner,88 T.C. 604 (1987); Haber v. Commissioner,52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970); Saigh v. Commis-sioner,36 T.C. 395, 420 (1961). [12]
*412 In 1980, Gieseman received $ 60,000.00 from Pentemation for a software program and programming later sold to UMH. At the time he received the money, Gieseman did not own the software program. He subsequently acquired two programs for a nominal sum. Gieseman dealt with petitioner in this transaction. Soon afterward, in October 1980, Gieseman made three payments to petitioner of cash and merchandise totaling $ 41,095.00. In 1981, the Maryland Attorney General's office's investigation of billing practices at UMH escalated and reached UMH's purchase of the software that Gieseman sold to Pentemation. Petitioner presented a copy of a loan agreement and an extension which Gieseman allegedly prepared. The loan agreement, dated October 31, 1980 provides for repayment of the $ 38,540.00 in cash that Gieseman advanced plus interest charged at an arm's-length rate within six months. The extension, dated April 15, 1981, pushes back the repayment date until the earlier of the sale of and settlement on petitioner's house in Baltimore or October 29, 1981. Petitioner was not required to provide any collateral for the loan. Neither the loan agreement nor the extension were witnessed or *413 recorded. Petitioner settlled on his house in July 1981 and paid Gieseman $ 45,640.00, consisting of the cash advanced plus $ 7,100.00 in "interest." The loan agreement and the fact that the "loan" was repaid with "interest" are factors indicative of a true loan. See In re Uneco,532 F.2d 1204, 1208 (8th Cir. 1976); Haber v. Commissioner52 T.C. at 266. Additional circumstances surrounding the transaction, however, convince us that at the time Gieseman made the payments to petitioner, neither party intended the money to be repaid. First, petitioner learned that the Attorney General's investigation had reached certain contracts with which he had been involved in June 1981. A month later he repaid Gieseman with interest, which we believe to have been an attempt to make the bribery payments look like a loan. In addition, the loan agreement was first produced during the Attorney General's investigation of billing practices at UMH. Because it was not witnessed or recorded, the only evidence we have that the loan agreement was not created for the investigation *414 is petitioner's and Gieseman's testimony. We did not find either Gieseman or petitioner to be reliable witnesses. Both were convicted of bribery in connection with the "loan" transaction in question. Gieseman's willingness to deceive his employer by surreptitiously starting a new business, James Walker and Associates, casts further doubt on his credibility. Respondent thoroughly impeached petitioner's credibility. Petitionee admitted that during the same investigation by the Maryland Attorney General's office, he had an employee of UMH procure a typing ball and official stationery for him and had another friend, Dottie MacMurray, prepare certain documents to be placed in the files at UMH. Petitionee met with Dottie MacMurray the night before she testified before the grand jury and told her that the documents she had created for him were not relevant. In addition, in November 1980, less than one month after he claims to have borrowed $ 38,540.00 from Gieseman, petitioner filled out a loan application for a new car and failed to include any reference to the alleged loan from Gieseman although specifically asked to list all debts. At trial he claimed that he lied on the car loan *415 application but was not telling the truth. We, therefore, find that the payments Gieseman made to petitioner in October 1980 were not loans. The $ 38,540.00 in cash and merchandise valued at $ 2,555.00 was thus income to petitioner in 1980, and petitioner may not deduct the $ 7,100.00 "interest" payment make in 1981. The next issue for decision is whether petitioner is entitled to a $ 15,000.00 bad debt deduction in 1979 for a loan he claims to have made to James Hanley in 1977 or 1978. Petitioner has provided no evidence other than his testimony to establish that such a loan was actually made. Even assuming that there was a loan, however, petitioner is not entitled to a deduction because he has not established that the debt became worthless in 1979. Section 166(a) allows a deduction for debts that become wholly or partially worthless within the taxable year. Petitioner has the burden of proof. Crown v. Commissioner,77 T.C. 582, 598 (1981); Rule 142(a). Generally, this burden is met by a showing that an identifiable event or a series of events occurred during *416 the year which effectively established that the debt had become worthless. Dustin v. Commissioner,53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972); Minneapolis, Ts. Paul & Sault Ste. Marie Railroad Co. v. United States,164 Ct. Cl. 226, 240 (1964). Petitioner has cited no identifiable event or series of events that occurred in 1979 that would indicate that the debt, assuming its existence, became worthless in that year rather than another year. Consequently, he is not entitled to a bad debt deduction in 1979. [13]
The final issue we must decide is whether any of the underpayments of *417 tax for the years in issue were due to fraud with intent to evade tax. See section 6653(b). Fraud is a factual question to be resolved by an examination of the entire record. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). To establish fraud, respondent must introduce clear and convincing evidence that petitioner acted with specific intent to evade taxes that he knew or believed he owed. Stephenson v. Commissioner,79 T.C. 995, 1005 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Rule 142(b). Respondent need not prove the precise amount of the underpayment resulting from fraud, but only that some part of the underpayment of tax for each of the years in issue is attributable to fraud. Lee v. United States,466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affd. a Memorandum Opinion of this Court. Fraud is never presumed, Beaver v. Commissioner,55 T.C. 85, 92 (1970), but may be proven by circumstatial evidence because direct proof of *418 a taxpayer's intent is rarely available. Stephenson v. Commissioner,79 T.C. at 1005-1006. Courts have relied on a number of indicia of fraud in deciding section 6653(b) cases. Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia is persuasive circumstantial evidence. Solomon v. Commissioner,732 F.2d 1459, 1461 (6th Cir. 1984) affg. per curiam a Memorandum of Opinion of this Court; Beaver v. Commissioner,55 T.C. at 93. First, a pattern of underreporting over an extended period of time is indicative of fraud. Foster v. Commissioner,391 F.2d 727, 733 (4th Cir. 1968), affg. on this issue a Memorandum Opinion of this Court; Brooks v. Commissioner,82 T.C. 413, 431 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). Second, a failure to maintain adequate books and records may indicate fraudulent intent. Estate of Upshaw v. Commissioner,416 F.2d 737, 741, (7th Cir. 1969), affg. a Memorandum Opinion *419 of this Court, cert. denied 397 U.S. 962 (1970). Third, a taxpayer's failure to furnish the government with access to his books and records may also indicate fraudulent intent. Solomon v. Commissioner,732 F.2d at 1461. Fourth, a taxpayer's lack of credibility, inconsistent testimony or evasiveness on the stand are heavily weighted factors in considering the fraud issue. Toussaint v. Commissioner,743 F.2d 309, 312 (5th Cir. 1984), affg. a Memorandum Opinion of this Court. Fifth, a taxpayer's business experience and knowledge of the tax laws may tend to prove or disapprove the existence of fraud. See O'Connor v. Commissioner,412 F.2d 304, 310 (2d Cir. 1969), affg. on this issue a Memorandum Opinion of this Court, cert. denied 397 U.S. 921 (1970). Finally, a taxpayer's dishonesty in business transactions or willingness to defraud others may indicate a willingness to defraud respondent. Afshar v. Commissioner,T.C. Memo. 1981-241, affd. without published opinion 692 F.2d 751 (4th Cir. 1982), cert. denied 461 U.S. 928 (1983). All of these factors are present *420 in this case and indicate that petitioner acted with fraudulent intent. Petitioner underreported his income for each of the years in issue. In 1979 he admittedly failed to report $ 11,100.00 in taxable income which he claimed, with no substantiation, was a repayment of a loan. Petitioner also failed to report $ 4,890.00 that he received from Boyle in 1979. For 1980, petitioner significantly underreported his income. He reported $ 74,000.00 that he was later convicted of stealing from the State of Maryland as a capital gain. Petitioner has admitted that he attempted to disguise the stolen funds as capital gains and that the money should have been reported as ordinary income. This deliberate, false reporting is evidence of fraudulent intent. Dorsey v. Commissioner,33 B.T.A. 295, 306 (1935). Petitioner also failed to report $ 41,095.00 received as bribes from Gieseman in 1980. In addition, he admittedly failed to report $ 445.00 in interest income and $ 900.00 in compensation received from Anne Arundel General Hospital. On his 1981 income tax return, petitioner failed to report a $ 6,500.00 bribe and a $ 3,500.00 bribe received from Boyle. He claimed *421 to have reported the $ 6,500.00 payment on his 1980 return and the $ 3,500.00 payment as part of a lump sum on his 1981 return but did not offer sufficient evidence to substantiate either claim. Petitioner did not maintain adequate books or records of his alleged business activities. [14] Petitioner is knowledgeable in business matters, yet he failed to maintain records (either keep them originally or keep copies, or a list, of documents turned over to authorities) to substantiate his claimed deductions. This failure is evidence of fraudulent intent, particularly in light of his illegal activities and his admitted familiarity with the tax laws. *422 Petitioner's lack of credibility, inconsistency on the witness stand and dishonesty in business transactions are further evidence of fraud. Petitioner has admitted to and been convicted of stealing from his employer, the State of Maryland, and of accepting bribes to influence him in the performance of his official duties. He also admitted to creating documents and attempting to have them placed in filed at UMH while the Attorney General's investigation was ongoing. Finally, petitioner testified that the bribe money he received from Gieseman was a loan. Yet, on an application for a car loan filed less than a month after he received the bribes, petitioner did not list the alleged loan as an outstanding debt. He then claimed that he had lied on that application by not including the loan from Gieseman. We conclude that petitioner acted with specific intent to evade taxes in 1979, 1980 and 1981. He is, therefore, liable for the additions to tax for fraud pursuant to section 6653(b). To reflect concessions, Decision wil be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. ↩
2. The deficiency and addition to tax for the taxable year 1979 reflect an increased deficiency pursuant to section 6214 and an increased addition to tax for fraud determined by respondent in his Second Amendment↩ to Answer filed February 25, 1987.
3. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
4. The petition was timely mailed, by certified mail, on June 3, 1985. See sections 7502 and 7503. ↩
5. See infra.↩
6. Petitioner testified that he reported the $ 6,500.00 payment on his 1980 return and the $ 3,500.00 payment as part of a lump sum on his 1981 return. He presented a work sheet that he claimed to have used in preparing his 1980 return listing a $ 6,500.00 payment from Boyle as income. Petitioner's testimony as to the nature of the payments was inconsistent and vacillating. Weighing his testimony we, therefore, conclude that he did not report the $ 6,500.00 payment in 1980 or the $ 3,500.00 payment in 1981. ↩
7. The record does not indicate why Pentemation was involved in the transaction. Pentemation appears to be a company engaged in the business of selling computer equipment. Boyle at one time was involved with Pentemation. ↩
8. See infra.↩
9. Petitioner pled guilty under an "Alford" plea, meaning that he denied guilt but recognized that the State had sufficient evidence to convict him and thus declined to defend himself. See North Carolina v. Alford,400 U.S. 25↩ (1970). 10. Even without the deemed admission we would have found that the $ 11,100.00 payment was taxable income. Petitioner offered nothing but his unconvincing testimony to establish that he had loaned anyone $ 11,100.00. ↩
11. Petitioner apparently concedes that the merchandise he received from Gieseman on October 22, 1980 valued at $ 2,555.00 constitutes taxable income. ↩
12. Courts have focused on several objective factors to determine whether a disbursement is a true loan. The factors relevant to this case include (1) the existence or nonexistence of a debt instrument; (2) provisions for security, interest payments and a fixed repayment date; (3) whether repayments were made; and (4) whether a third party would have made the loan under the same circumstances. See In re Uneco, Inc.,532 F.2d 1204, 1208 (8th Cir 1976); In re Indian Lake Estates, Inc.448 F.2d 574, 578-579 (5th Cir 1974); Haber v. Commissioner,52 T.C. 2155, 266 (1969), affd. 422 F.2d 198↩ (5th Cir. 1970). These cases concerned whether cash advances between closely held corporations and shareholder/employees constituted bona fide loans as opposed to disguised dividends, compensation or contributions to capital. The instant case also involves a transaction between parties not dealing at arm's length and the same underlying principles govern our decision. 13. Even if the debt had become worthless in 1979, it would be deductible only as a short-term capital loss because it was a non-business debt. A non-business debt is one not proximately related to any trade or business of the taxpayer. Section 1.166-5(b), Income Tax Regs. Petitioner is not in the business of making loans and his dominant motivation in making the alleged loan in this case was not related to any business activity. See United States v. Generes,405 U.S. 93, 103↩ (1972). 14. We have already found that petitioner did not meet his burden of proving that he was in a trade or business during the years in issue. Petitioner contends that he was unable to provide documentary evidence of his business activities because he had turned them over to the Internal Revenue Service in the course of a prior audit and to his previous attorney and the state of Maryland during his criminal trials. Petitioner has also moved twice and spent time in jail. Petitioner admitted, however, that he made no effort to obtain information to substantiate his alleged business activities because to do so "would be costly and burdensome." ↩