DONALD S. MORRIS AND JUNE E. MORRIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Morris v. Commissioner
Docket No. 20318-87
United States Tax Court
T.C. Memo 1990-306; 1990 Tax Ct. Memo LEXIS 324; 59 T.C.M. (CCH) 923; T.C.M. (RIA) 90306; June 19, 1990, Filed *324 Decision will be entered under Rule 155. Alvin L. Freeman, for the petitioners. *325 Ana G. Cummings, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a $ 288,250.93 deficiency and a $ 13,259.10 addition to tax under section 6651(a)(1) [1] against petitioners for their calendar year ending December 31, 1981. On brief, petitioners concede that they are liable for the addition to tax under section 6651(a)(1). Furthermore, the parties agree that $ 165,000 is a partnership distribution within the meaning of section 731(a) and is taxable as a short-term capital gain. After concessions, the issues for decision are whether petitioners are entitled to deduct any portion of the expenditures made to complete earthen dam contracts as (1) trade or business expenses under section 162; if not (2) whether any portion is deductible *326 as a bad debt under section 166. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein. Petitioners resided in Houston, Texas, at the time they filed their petition in this Court. Petitioners' joint individual Federal income tax return for calendar year 1981 was received by the Internal Revenue Service Center, Austin, Texas, on September 30, 1982, extensions to file having been granted to September 15, 1982. Unless otherwise indicated, reference to petitioner refers to Donald S. Morris. The "completion costs" at issue in 1981 actually involve expenditures and advances made by petitioner in prior years. Therefore, we must consider the circumstances of these payments. Before 1953 petitioner and his brother, Tommy Morris (hereinafter referred to as "Tommy"), operated a family business. In March 1953 petitioner and seven others formed Drillco Incorporated ("Drillco"). Thereafter, petitioner and Tommy merged their business into Drillco. As a result of the this merger, petitioner purchased 375 shares (15 percent) of Drillco's stock. Drillco was engaged in the oil field service *327 business and subsequently expended its business into manufacturing. In 1968 Drillco was acquired by Smith International, Inc. ("Smith"), a publicly held corporation, in a stock-for-stock reorganization, and became a Division of Smith. Between 1968 and 1977 petitioner served as president of Drillco and as Group Vice President of Smith. In August 1977 petitioner terminated his employment. At that time petitioner was drawing an annual $ 120,000-plus salary, was 48 years of age, and owned Smith stock having a substantial value. In August or September 1977 petitioner was approached by Winslow Whiting [2] ("Mr. Whiting") and Glenn G. Chance ("Mr. Chance") each wanting to go into their own separate businesses. Petitioner had known both men for over 15 years as a result of their business relationship in the oil industry. Petitioner agreed to go into business with them. *328 On September 2, 1977, and September 9, 1977, petitioner entered into two separate pre-incorporation agreements with Mr. Whiting and Mr. Chance forming Whiting Oil Field Rental, Inc. ("Whiting") and Chance Collar Company ("Chance"), respectively, both Texas corporations. Whiting was to engage in the business of owning and renting various items of oilfield tools and equipment, while Chance was to engage in the business of fabricating, repairing, and selling equipment and tools used in drilling oil wells. Both Whiting's and Chance's pre-incorporation agreements provided that petitioner be retained as a consultant for a monthly fee of the lesser of a percentage of the after-tax profits, or $ 1,000. Additionally, petitioner was allowed to purchase 250 shares of the companies' stock at one dollar ($ 1.00) per share. Neither Mr. Whiting nor Mr. Chance was financially able to obtain sufficient financing to start his corporation. Therefore, petitioner agreed to lend or guarantee bank loans of up to $ 300,000 to each corporation. Additional facts relating to Whiting
Pursuant to Whiting's pre-incorporation agreement, petitioner acquired 25 percent of the stock for $ 250, *329 and Mr. Whiting acquired the remaining 75 percent for $ 750. Petitioner made sales calls and management decisions for Whiting. During 1978 and 1979 petitioner spent approximately 25 percent and 10 percent of his time, respectively, working for Whiting. However, he did not report any income from the consulting activity from 1977 through 1979 on his Schedules C. In August 1979 Whiting was acquired by Philadelphia Suburban Corporation ("PSC"), a Pennsylvania corporation, in a stock-for-stock reorganization. After this acquisition, petitioner served on the board of PSC's sister company, Oil Field Rental. Petitioner received dividend income from PSC from 1979 through 1982.
Additional Facts Relating to Chance
In 1978 Chance was formally incorporated. The incorporation agreement differed from the terms of the pre-incorporation agreement in three distinct ways. First, the consulting arrangement was changed to include Tommy as an additional consultant. Second, it provided that both petitioner and Tommy be paid a specific monthly consulting fee pursuant to the amounts indicated in the schedule contained therein. Third, it provided that petitioner and Tommy would jointly *330 guarantee loan obligations of up to $ 2,000,000. Moreover, they were to secure that guarantee with their individually owned assets, rather than Chance's. However, Chance was required to pledge its assets as security for petitioner and Tommy. Petitioner and Tommy guaranteed the loans in order to help Chance establish its own line of credit, to get the necessary inventory Chance needed to operate, and to enable Chance to pay its consulting fees. Pursuant to the incorporation agreement Tommy and petitioner each purchased 12.5 percent of the stock in Chance for $ 125, while Mr. Chance purchased the remaining 75 percent for $ 750. During 1978 and 1979 petitioner spent approximately 40 percent and 10 percent of his time, respectively, rendering services to Chance. However, he did not report any income from this activity on his Schedule C for either year. Sometime between December 1979 and mid-1980 Chance was acquired by W. R. Grace, Co. ("Grace"), a publicly held corporation, in a stock-for-stock reorganization. Petitioner remained affiliated with Grace after the stock swap, and received dividends on his Grace stock from 1980 through 1982. Facts Relating to Producers
*331 On February 22, 1978, Barron Muegge ("Mr. Muegge"), Joe S. Rosson ("Mr. Rosson"), and petitioner formed Producers Construction Co., Inc. ("Producers"). Producers was to engage in the business of excavating, dirt contracting, general contracting, and construction. Petitioner had no knowledge of or experience in the earth-moving business. On May 5, 1978, Producers filed a Statement of Change of Registered Office and Registered Agent, removing Mr. Muegge and substituting Mr. Rosson. Mr. Rosson was also Producers' president and operating officer. Petitioner and Messrs. Rosson and Muegge also agreed to the following: (1) that petitioner would receive 50 shares of stock at $ 1.00 per share (50 percent), while Mr. Rosson and Mr. Muegge would receive 25 shares each; (2) that petitioner would arrange for Producers to borrow a total sum of $ 1,000,000 and guarantee its repayment by collateralizing his individually owned assets, including any stock; and (3) that petitioner would be retained as a consultant to Producers and paid a monthly fee, as set forth in the schedule contained therein. Producers' total capitalization was $ 1,000. Producers had two divisions. One was engaged in *332 site preparation, general construction, and maintenance of oil field locations and pipeline construction. All of the required equipment was financed by purchase money loans guaranteed by petitioner. The other division was engaged in heavy construction, primarily construction of earthen dams. On March 10, 1978, Producers, through Mr. Rosson as president, signed a 90-day note for $ 1,000,000 payable to Houston National Bank, and petitioner executed a guarantee agreement with Houston National Bank for that amount. In May or June 1978 Producers secured three contracts with the United States Department of Agriculture to build earthen dams. The contracts required payment and performance bonds in favor of the United States. Since Producers lacked sufficient capital to obtain the required payment and performance bonds, petitioner and Messrs. Rosson and Muegge, individually, and Mr. Rosson, as president of Producers, executed a General Indemnity Agreement on June 27, 1978, with American General Insurance Company ("American") guaranteeing both performance and payment of the government contracts. Thereafter, Producers began performance of the government contracts. Sometime later, petitioner *333 and Messrs. Rosson and Muegge realized that Producers was incapable of completing the jobs since they lacked the technical expertise and the necessary equipment. Therefore, in or around August 1978 Producers informally subcontracted with KC&S Construction Company, a partnership, to complete performance of the contracts. KC&S, however, was unable to perform on this subcontract without additional financing. Therefore, petitioner, concerned that the government contracts would not be completed, guaranteed both working capital and equipment loans for KC&S. On August 11, 1978, petitioner executed a Specific Guaranty to the Lufkin National Bank related to KC&S's $ 56,204 debt, and on September 19, 1978, petitioner executed a Guaranty Agreement to Houston National Bank relating to KC&S's outstanding debts of $ 68,000 and $ 300,000. Sometime between June 27, 1978, and September 19, 1978, petitioner learned that the government would not allow Producers to remove its name from the contracts and replace it with the name of the entity actually performing the work. On August 22, 1978, Mr. Muegge resigned, returned his stock, and, pursuant to a written agreement of all parties, [3] was completely *334 released from any and all rights and liabilities under the February 22, 1978, incorporation agreement. By December 1978 Producers' financial affairs had deteriorated to the point that it could no longer operate. Accordingly, petitioner hired Richard D. Johnston, a graduate accountant and an employee of Carroll Thompson, CPA, an accounting firm. Mr. Johnston began working exclusively on petitioner's problems relative to Producers. His services consisted of ascertaining Producers' overall financial situation as it regarded the earthen dam projects. The accounting firm, rather than Donald S. Inc., [4] paid Mr. Johnston for the services he rendered to petitioner. *335 While working for petitioner Mr. Johnston met Mr. Pouyer, an employee of KC&S. Mr. Pouyer wanted to form his own general construction company. By December 1978 Messrs. Pouyer and Johnston formed Shelby County Construction Services, Inc. ("Shelby"), a Texas corporation. [5]Shelby was initially capitalized with $ 1,000 with each investor contributing $ 1.00 per share of stock. Upon Shelby's incorporation Mr. Pouyer acquired a 60-percent interest, Mr. Johnson a 15-percent interest, and petitioner a 25-percent interest. Since Mr. Pouyer lacked sufficient financial resources to sufficiently capitalize Shelby, petitioner agreed to guarantee loans and advance funds to Shelby. On or about December 15, 1978, Shelby executed a $ 185,699 note and a $ 423,091 note (two notes totaling $ 608,790) to Houston National Bank, and pursuant to a request by lenders, petitioner executed a guarantee in favor of Houston National Bank on behalf of Shelby. On or *336 about December 28, 1978, Shelby purchased a $ 100,000 Certificate of Deposit at Crocker National Bank for petitioner. In addition, Shelby paid $ 491,475.68 of petitioner's loans at various banks. Shelby also recorded an account payable to petitioner of $ 17,314.32. On January 1, 1979, Producers forfeited its right to transact business in Texas. [6] However, its Certificate/Charter was not forfeited until March 13, 1980. On or about February 7, 1979, Producers, although no longer authorized to transact business in Texas, through petitioner, and Shelby, through Mr. Johnston as secretary-treasurer, entered into a formal contract to ensure the completion of the Bosque County earthen dam. Producers contractually agreed to pay Shelby for its work. Accordingly, Producers terminated its informal contract with KC&S on the Bosque project. [7]
*337 On February 27, 1979, Shelby, through petitioner as director, and petitioner in his individual capacity, executed a Continuing Guaranty in favor of Crocker National Bank. Additionally, Shelby, through petitioner as director, executed a $ 240,875 Purchase Money Security Agreement with Conley-Lott-Nichols Machinery Company ("Conley"), Dallas, Texas. Petitioner and Messrs. Pouyer and Johnston individually guaranteed payment of the Conley note. On March 2, 1979, KC&S executed a $ 30,000 note payable to Union Bank of Houston, Texas, and petitioner executed a Continuing Guaranty for the note. On March 15, 1979, petitioner, on behalf of Producers, guaranteed a $ 102,847 note with the Bank of A & M in College Station, Texas. On April 27, 1979, Producers' $ 1,000,000 loan with Houston National Bank was "transferred" to First State Bank of Bellaire. Shelby's name was inserted in lieu of Producers. Thereafter, Shelby, through petitioner as vice president, executed the $ 1,000,000 60-day note payable to First State Bank of Bellaire. The note was collateralized by Shelby's equipment and Smith and Shelby stock. Petitioner as vice president of Shelby renewed this note on June 26, 1979. *338 On May 25, 1979, Mr. Rosson resigned as president and Director of Producers and tendered all his Producer's stock to petitioner, leaving petitioner Producers' sole shareholder. Also, on May 25, 1979, Shelby paid petitioner $ 20,000 to reduce the amounts he had advanced it. Producers, by way of KC&S and Shelby, completed the work on the two government contracts, other than the Bosque project, on July 13, 1979, and November 28, 1979. The United States Department of Agriculture formally accepted Producers' completion of the contracts. During 1978 and 1979 petitioner spent approximately 35 percent and between 60 to 80 percent of his time, respectively, rendering services to Producers. However, petitioner did not report any income from such activity on his 1978 or 1979 Schedules C. From February through November 1979 petitioner and Messrs. Johnston physically worked with Shelby in order to enable it to complete Producers' contracts. In May or June 1979 Mr. Johnston began receiving a salary from Shelby. Petitioner, however, never received any form of compensation from Shelby. In November 1979 Mr. Johnston disposed of all his Shelby Stock. During the course of completing the *339 Bosque County Dam Shelby encountered large amounts of unexpected ground water. Although the water flow was never completely stopped, the dam was completed on February 7, 1980. In June 1980 in a letter addressed to Producers, the United States Department of Agriculture made formal acceptance of the completion of the Bosque County dam. As a result of the cost overruns on the Bosque County project, Producers filed a claim with the Soil Conservation Service and was later awarded $ 162,000. Petitioner, on behalf of the defunct Producers, disbursed most of the award to approximately 12 creditors, some of whom had filed liens with American on the jobs. Additionally, Shelby incurred $ 579,030.63 in additional costs as the result of the delays and additional construction. On October 31, 1981, Shelby (Petro Site) sent petitioner three invoices totalling $ 579,030.63. On November 13, 1981, petitioner personally paid the $ 300,000 invoice. In addition to securing loans [8] for Shelby and guaranteeing various loans made to Shelby, petitioner advanced or made payments to or on behalf of Shelby, in the following amounts: DATE
PAYEE
AMOUNT
February 21, 1979
Conleco, Inc. [9]
$   5,000
March 27, 1979
Shelby
25,786
August 28, 1979
Conleco, Inc.
10,000
September 7, 1979
Shelby
100,000
October 4, 1979
Shelby
5,000
January 4, 1980
First Bank of Bellaire
70,000
November 13, 1981
Petro Site, Inc. [10]
300,000
$ 515,786
*340 Shelby (Petro Site) never gave petitioner any notes evidencing advances or loans he made to it directly. The only note in existence was one for $ 1,790,000 which was secured by Shelby's equipment. Moreover, there were no formal repayment schedules devised between the parties. Petitioner expected repayment "when the money was there and available to be paid back." Petitioner returned his Shelby stock to the company sometime between November 1981 and February 1982. In a letter dated February 8, 1988, addressed to Mr. Richard D. Johnston, CPA, the United States Department of Agriculture confirmed *341 that Producers performed all work required under the three contracts. Additional Facts
In March 1980 after Shelby completed its obligations under its contract with Producers, petitioner and William K. Baker ("Mr. Baker") formed a company named Baker Oil Field Sales and Service ("Baker"). Petitioner owned 3/7 and Mr. Baker owned 4/7 of the stock issued and outstanding. Petitioner performed various services for Baker including promoting Mr. Baker by introducing him to others in the industry. Petitioner also participated in management consulting, decision making, and sales. Petitioner received and reported $ 32,000 and $ 19,000 in salary income from Baker in 1981 and 1982, respectively.
Tax Return Information
On their joint individual Federal income tax return for 1977 petitioner reported $ 72,675.38 salary income, and $ 93,989 dividend income from Smith. On his Schedule C petitioner reported his occupation as "Consultant". Petitioner did not receive any consulting fees during 1977 from any entity. On his 1978 Schedule C petitioner reported his occupation as "Investor". However, no income from that activity was reported, although he claimed a $ 773,572.98 *342 business bad debt deduction. On his 1979 Schedule C petitioner reported his occupation as "Investments". Again, no income was reported from that activity, although a $ 33,955.25 business bad debt deduction, related to Producers, was claimed. On his 1980 Schedule C petitioner again reported his occupation as "Investments," and reported $ 13,975 gross receipts therefrom: $ 2,625 from Texas General Resources; $ 1,350 from Bank of A & M; and $ 10,000 from Baker. He also claimed $ 90,000 in business bad debts, $ 45,000 relating to KC&S. Petitioners did not report any wage income on their joint Form 1040. On their 1981 individual Federal income tax return petitioners reported $ 32,000 in wage income from Baker. On his Schedule C petitioner again described his business activity as "investments," and reported $ 278,334 gross receipts: $ 56,834 from Texas General Resources; $ 1,500 from Republic Bank -Director's Fee; $ 50,000 from Donald S. Inc. - Director's Fee; $ 5,000 from Adspec; and $ 165,000 from MAPP II partnership. Petitioner also claimed a $ 492,500.08 "completion costs" deduction. Respondent disallowed the entire $ 492,500.08 deduction on the basis that such expenditures *343 were properly capital contributions to Shelby (Petro Site). On their 1982 joint individual Federal income tax return petitioners reported $ 19,000 in wage income from Baker. On his 1982 Schedule C petitioner reported his occupation as "Consulting," and doing business as "Donald S. Morris." From 1978 through 1982 Donald S. Inc., rather than petitioner, received and reported all payments made by Whiting, Chance, Producers, and Shelby. [11] However, Donald S. Inc. never deducted any expenses relating to any of these corporations. Instead petitioner claimed deductions on his Schedules C, as indicated above. *344 Although petitioner planned to derive salary income from Donald S. Inc., he did not receive any type of distribution from Donald S. Inc. until 1981, when he received a $ 50,000 director's fee. Petitioners alleged in their petition that the completion costs claimed on their 1981 return were understated, and that $ 595,786 represents the actual amount expended. The $ 595,786 includes the $ 100,000 certificate of deposit that petitioner alleges was forfeited to the Crocker National Bank and applied to a loan of Shelby. Before trial, petitioners claimed $ 615,786 as the proper amount of expenses. OPINION The first issue for decision is whether petitioners are entitled to deduct the $ 615,786 completion costs as an ordinary and necessary business expense in 1981. Petitioners bear the burden of proving their entitlement to a section 162 deduction. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Deputy v. du Pont, 308 U.S. 488 (1940), enunciated the general principle that expenses of a corporation paid by a shareholder [12] (even a majority or sole shareholder) are not ordinary and necessary expenses of the shareholder, but rather constitute *345 either a loan or a contribution to capital. See Noland v. Commissioner , 269 F.2d 108, 111 (4th Cir. 1959), affg. a Memorandum Opinion of this Court; Westerman v. Commissioner, 55 T.C. 478, 482 (1970); Rink v. Commissioner, 51 T.C. 746 (1969). However, an exception is made when a taxpayer makes expenditures to protect or promote his own business, even though the transaction giving rise to the expenditures originated with another person (or entity), and would have been deductible by that person (or entity) if payment had been made by him (or it). See Lohrke v. Commissioner, 48 T.C. 679, 684-685 (1967); Pepper v. Commissioner, 36 T.C. 886 (1961); Bronston v Commissioner, T.C. Memo. 1975-5. Accordingly, we must decide whether petitioner made these payments in order to protect his own trade or business. *346 Trade or Business
Section 162 allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Petitioners allege that petitioner Donald S. Morris was in the trade or business of forming corporations, consulting from 1977 through 1981, or building earthen dams, and that the payments were made to protect petitioner's business reputation and credit with the various banking institutions. Respondent contends that petitioners have failed to prove that the activity of "Donald S. Morris," as reported on their 1981 Schedule C, constituted a trade or business. Additionally, respondent contends that petitioner was merely an investor in Producers and Shelby, and expected to receive capital appreciation and dividends as the fruits of his involvement therein. We agree with respondent. Whether activities of an individual constitute carrying on a trade or business depends upon an examination of the facts in each particular case. Higgins v. Commissioner312 U.S. 212, 217 (1941). As the Supreme Court stated in Whipple v. Commissioner, 373 U.S. 193, 202 (1963): Devoting *347 one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement of the value of an investment, this return is distinct to the process of investing and is generated by the successful operation of the corporation's business, as distinguished for the trade or business of the taxpayer * * * .
Since the business of a corporation is separate from the business of its officers and shareholders, Deputy v. du Pont, supra, the taxpayer must establish that the compensation he sought from his activity is other than the "normal investor's return and that the income received is directly for his services rather than indirectly through the successful operation of the corporate enterprise." Deely v. Commissioner, 73 T.C. 1081, 1093 (1980). See Whipple v. Commissioner, 373 U.S. at 203. It is clear, based on Whipple and Deely, that for an activity (forming corporations or consulting) to qualify as a separate business, it must be conducted for a fee, commission, *348 or with the immediate purpose of selling the corporations at a profit in the ordinary course of that business. See Bodzy v. Commissioner, 321 F.2d 331 (5th Cir. 1963), affg. in part and revg. in part a Memorandum Opinion of this Court; United States v. Byck, 325 F.2d 551 (5th Cir. 1963); Millsap v. Commissioner, 46 T.C. 751 (1966), affd. 387 F.2d 420 (8th Cir. 1968). Petitioner alleges that (1) his dominant motive in forming the corporations and consulting was to replace the annual $ 120,000-plus income he lost when he terminated his employment with Drillco; [13] (2) since he conducted those activities on a regular and continuous basis he is deemed to be in a separate trade or business; and (3) he guaranteed the performance and payment bonds to receive income from Producers. We do not agree. With the exception of Baker *349 in 1981 petitioner never received any type of income from any of the corporations he helped form, including Producers. Instead all fees paid by those corporations were paid directly to Donald S. Inc. "To be in a trade or business one must intend to make a profit." Leamy v. Commissioner , 85 T.C. 798, 807 (1985). It is clear that petitioner did not expect to make a profit from his consulting activity or from forming these corporations. He, individually, never received a dime. Additionally, we find petitioner was not even engaged in the trade or business of being an employee of Producers. [14] An officer or employee who provides services without compensation is not engaged in a trade or business of being an employee. Low v. Nunan, 154 F.2d 261 (2d Cir. 1946), affg. a Memorandum Opinion of this Court; Snarski v. Commissioner, T.C. Memo. 1981-328. *350 Accordingly, we find petitioner's motive in guaranteeing Producers' performance bonds was not to protect his salary or employment with Producers. Petitioner also never received a salary or any other form of compensation from Donald S. Inc. from 1977 through 1980. Therefore, any payments petitioner made to or for the benefit of Shelby (or Producers) were again not made to protect his income from or employment with Donald S. Inc. [15] See Gould v. Commissioner, 64 T.C. 132 (1975). Additionally, we find petitioner did not consider himself to be in the trade or business of consulting. Petitioner described his business activity as "Investments" on his Schedules C from 1978 through 1981. It is well settled law that management of one's investments does not constitute a trade or business. Whipple v. Commissioner, 373 U.S. at 202; *351 Higgins v. Commissioner, supra.
Based on the foregoing, we find that, in the absence of any salary or other compensation, petitioner's activities of forming the various corporations or providing services to them fails to constitute a separate trade or business. Low v. Nunan, supra; Meyer v. Commissioner, T.C. Memo. 1983-208; Nichols v. Commissioner , T.C. Memo. 1963-148. The evidence supports a finding that petitioner's motive in entering into the relationships with the various corporations was that of an investor. Petitioner also claims that his activities, after January 1, 1979, could properly be characterized as "Donald S. Morris," doing business as "Producers Construction Company" and that all the payments to or on behalf of Shelby were related to the construction of the earthen dams. Again, we disagree and find that petitioner did not step into the trade or business of building earthen dams. Producers and Shelby, not petitioner, were in the trade or business of building earthen dams. Petitioner held a 50-percent stock interest in Producers and a 25-percent stock interest in Shelby. At the time Producers entered *352 into the contract with Shelby it still had its corporate certificate, was still recognized as a corporation for Federal tax purposes, and remained a separate entity. See Messer v. Commissioner, 438 F.2d 774 (3d Cir. 1971), affg. 52 T.C. 440 (1969); United States v. Young,604 F. Supp. 164 (N.D. Okla. 1984); McDonnell v. Commissioner, T.C. Memo. 1965-125. The fact that petitioner honestly considered the completion of the earthen dams his personal obligation, rather than that of the defunct Producers, or that petitioner might have been required by law to pay any obligations arising under the indemnity agreement should Producers default, is of no consequence in determining whether he was in a separate trade or business. Ihrig v. Commissioner, 26 T.C. 73, 76 (1956). The mere furnishing of management or other services to a corporation in return for a normal investor's return is not a trade or business. Whipple v. Commissioner, supra.
Moreover, petitioner did not report any of the income received pursuant to the government contracts on any of his personal income tax returns. The *353 three government contracts were completed on July 13, 1979, November 28, 1979, and February 7, 1980. Obviously payment was made to "Producers" since it was the only entity the government contracted with. If petitioner had, in fact, stepped into Producers' shoes, then any payments made to Producers would have been reported on petitioner's Schedules C. They were not. Based on the foregoing, we conclude that everything petitioner did with respect to, and on behalf of Producers and Shelby, he did in his capacity as a shareholder. Accordingly, we find that petitioner was not in a separate trade or business of either forming corporations, consulting, or of building earthen dams. [16]
*354 Bad Debt or Contribution to Capital
We must next decide whether petitioners are entitled to deduct any portion of the completion costs as bad debts under section 166, or whether they properly constitute contributions to capital. Petitioners allege that the payments were made to complete the earthen dams and, alternatively, since they expected repayment, the advances and disbursements should be treated as loans. Respondent, however, contends that petitioners have failed to establish the relationship of these payments with any guarantees and, therefore, they represent capital contributions to Shelby. Alternatively, respondent contends that if the payments are characterized as loans they are deductible only as nonbusiness bad debts, since they were not proximately related to any trade or business of petitioner. Respondent also contends that petitioners have failed to reduce the amount they now claim by the $ 20,000 Shelby paid them on May 25, 1979. In distinguishing between debt or equity, the courts resolve the issue on a case-by-case basis, depending upon the facts and circumstances of the particular case. John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946); *355 Harlan v. United States, 409 F.2d 904, 907 (5th Cir. 1969). In determining whether a shareholder's payment to or on behalf of a corporation is a loan or a contribution to capital, the United States Court of Appeals for the Fifth Circuit, to which any appeal in this case will lie, uses the following 13 factors: (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement. [Texas Farm Bureau v. United States, 725 F.2d 307, 311 (5th Cir. 1984), quoting *356 Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972).]
No single factor alone is determinative and they should be used only as aids in analyzing the transaction. Furthermore, for an advance or disbursement to constitute a true loan there must have been at the time the parties entered into the transaction an unconditional intention on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment. Haag v. Commissioner, 88 T.C. 604 (1987); Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970). See Slear v. Commissioner, T.C. Memo. 1987-395. On November 13, 1981, after extensive negotiations with Mr. Pouyer, petitioner paid Shelby (Petro Site) $ 300,000 pursuant to the Producers/Shelby contract. Although petitioner was not personally liable under the Producers/Shelby contract to pay Shelby if Producers failed to do so, it is clear that petitioner was ultimately personally liable under American's indemnity agreement. Petitioner had two choices with respect to paying Producers' creditors: *357 (1) wait and allow American, as surety, to pay off any liens on the project and then, when called upon to do so, indemnify American for its payments; or (2) to immediately pay off the customers' claims directly, thereby limiting his losses by avoiding the necessity of reimbursing American for its expenses and costs, including counsel fees. We believe petitioner would have been required to make good on the indemnity. Although, in form, petitioner's obligation ran to American, in substance petitioner was ultimately liable to pay off any creditors associated with the government contracts. By paying the customer directly, petitioner merely "telescoped the transaction," thereby avoiding additional expenditures that would have arisen had American been called upon first to liquidate the creditors' claims. Andrew v. Commissioner, 54 T.C. 239 (1970). An indemnitor in a four-party situation is to be treated the same as a guarantor. United States v. Hoffman, 423 F.2d 1217 (9th Cir. 1970); Horne v. Commissioner, 59 T.C. 319, 333-337 (1972), affd. 523 F.2d 1363 (9th Cir. 1975), cert. denied 439 U.S. 892 (1978); *358 Nicewander v. Commissioner, T.C. Memo. 1975-234. A guarantor, upon payment, stands in a creditor-debtor relationship with his principal, and must look to section 166 for deduction of related losses. [17]
Since we find that petitioner was not in any trade or business, including that of being an employee of Producers, we find that the $ 300,000 is deductible under section 166 as a nonbusiness bad debt in the year it became worthless. See United States v. Generes, 405 U.S. 93, 103 (1972); *359 Whipple v. Commissioner, supra; Benak v. Commissioner, 77 T.C. 1213 (1981); Shinefeld v. Commissioner, 65 T.C. 1092, 1096 (1976); Modell v. Commissioner, T.C. Memo. 1983-761. Additionally, we find that the $ 300,000 payment was worthless in 1981 when petitioner paidShelby (Petro Site). See Putnam v. Commissioner, 352 U.S. 82 (1956); Nelson v. Commissioner, 281 F.2d 1, 4 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Modell v. Commissioner, supra.
Based on the foregoing, we find petitioner is entitled to a $ 300,000 short-term capital loss under section 166(d) in 1981. As for the remaining $ 295,786, [18] we agree with respondent that petitioner failed to present any evidence establishing that these expenses were actually connected to, or made on behalf of, Producers, rather than made for the benefit of Shelby. Accordingly, unless petitioner establishes the existence of a bona fide loan or guarantee agreement between himself and Shelby, the amounts constitute capital contributions to Shelby. *360 After reviewing the evidence we hold that petitioner failed to prove that (1) the $ 110,786 [19] paid directly to Shelby, or the $ 15,000 paid directly to Conleco, Inc., constituted a loan rather than a capital contribution to Shelby; (2) he personally guaranteed the $ 70,000 payment to the First State Bank of Bellaire; or (3) that his $ 100,000 certificate of deposit was in fact applied to an outstanding loan of Shelby. (1) Petitioner testified that he anticipated repayment of the sums so expended. Producers, however, was defunct as of February 21, 1979. Therefore, petitioner could not have expected repayment from Producers, but rather must have expected repayment from Shelby. Petitioner, however, did not present any documentary evidence establishing the existence of a bona fide debtor-creditor relationship with Shelby; i.e., maturity date, notes, fixed payment schedule, *361 or payment of interest. The absence of notes or other instruments of indebtedness, or the absence of a fixed maturity date and a fixed obligation to repay, are strong indications that the advances are capital contributions rather than loans. Estate of Mixon v. United States, 464 F.2d 394, 403-404 (5th Cir. 1972). Moreover, petitioner testified that although he expected repayment of the amounts advanced to Shelby, he did not expect repayment until Shelby had sufficient funds available to pay him back. If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution. Estate of Mixon v. United States, 464 F.2d at 405. Moreover, an expectation of repayment solely from corporate earnings is not indicative of bona fide debt regardless of its reasonableness. See Lane v. United States, 742 F.2d 1311, 1314 (11th Cir. 1984); Betson v. Commissioner, 802 F.2d 365, 371 (9th Cir. 1986), affg. in part and revg. in part a Memorandum Opinion of this Court. Additionally, we note that Shelby was capitalized with only $ 1,000, and petitioner *362 was the only shareholder who had the financial wherewithal to fund the corporation's expenses. Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans. See Estate of Mixon v. United States, 464 F.2d at 408. Accordingly, we hold that petitioner failed to prove that a true debtor-creditor relationship existed with Shelby. [20]
(2) Petitioner testified that the $ 1,000,000 loan originally obtained from Houston National for Producers was moved to First State Bank of Bellaire and entered into on behalf of Shelby, and that he personally guaranteed such note. Upon review of the note itself we find that petitioner did not individually guarantee its payment. The loan was collateralized by Shelby's equipment, Shelby's and Smith's stock, *363 and was signed on behalf of Shelby by Don Morris as vice president. Thus, we conclude that petitioner voluntarily made the payment on behalf of Shelby. See Noland v. Commissioner, 269 F.2d 108, 111 (4th Cir. 1959), affg. a Memorandum Opinion of this Court, cert. denied 361 U.S. 885 (1959); Westermam v. Commissioner, 55 T.C. 478, 482 (1970). (3) Petitioner alleges that Crocker National Bank told him that the $ 100,000 certificate of deposit was applied against an outstanding loan of Shelby. In support thereof, petitioner introduced a November 8, 1979, bank slip debiting $ 479,649.53 from his account "for the purchase of two (2) cashier's checks to pay off Crocker National Bank, California." Below this inscription, petitioner wrote "100,000 CD applied to principal 579,649.53." We find this evidence insufficient to prove that the $ 100,000 certificate was in fact applied to any loan of Shelby. Accordingly, we hold that petitioners failed to prove that the $ 100,000 was even a capital contribution. Based upon the foregoing, we conclude that $ 195,786 properly represents capital contributions to Shelby rather than loans. To reflect *364 the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for 1981. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Before August 1977 Mr. Whiting approached petitioner and asked him if they could go into business together. However, because petitioner was still employed with Drillco, he declined.↩
3. Mr. Muegge, Producers, petitioner, and Mr. Rosson.↩
4. In December 1977 petitioner formed Donald S. Inc., a wholly owned Texas corporation. It was to engage in the principal activity of "Business Services" with the product being "Consulting." Petitioner used the corporation as an accounting entity to account for the revenues and expenses of the consulting arrangements he had with Whiting, Chance, Producers, and others.↩
5. Shelby was not formally incorporated until January 3, 1979.↩
6. This resulted from its failure to file its franchise tax report and revive its right to do business in 1978.↩
7. Although KC&S remained responsible for completing the other two contracts, Shelby actually completed them.↩
8. On June 26, 1980, Shelby, through petitioner as vice president, executed a $ 34,729.39 promissory note payable to First State Bank of Bellaire. On September 24, 1980, the note was renewed. On May 18, 1981, the note was paid in full. ↩
9. A company unrelated to petitioner. ↩
10. On February 26, 1982, pursuant to an amendment to the Articles of Incorporation, Shelby's name was officially changed to Petro Site, Inc.↩
11. Donald S. Inc. received and reported on its Form 1120 [Corporation Income Tax Return], the following amounts: ↩
Whiting
Chance
Producers
Shelby
1978
$ 21,000.00
$ 22,464.25
$ 9,501.00
$    -0-   1979
37,000.00
33,080.68
-0-
6,000.00
1980
50,000.00
39,376.70
-0-
20,000.00
1981
65,000.00
8,314.32
-0-
-0-   1982
5,000.00
-0-   -0-
6,000.00
12. This includes employees or corporate officers. See Rink v. Commissioner, 51 T.C. 746↩ (1969).
13. "To replace such income, Donald S. Morris has sought consulting fees and salaries from corporations which he helped form."↩
14. See Van Fossan v. Commissioner, T.C. Memo. 1983-703; Meyer v. Commissioner, T.C. Memo. 1983-208↩.
15. The only distribution petitioner received from Donald S. Inc. occurred in 1981 when he received a $ 50,000 director's fee which he included on his 1981 Schedule C.↩
16. Even if we were to find that petitioner was in a separate trade or business, only the $ 300,000 payment to Shelby (Petro Site) could possibly qualify as a section 162 deduction in 1981, since all other payments were made before that year. Furthermore, the $ 300,000 could qualify as a deduction only if we found it was an ordinary and necessary expense rather than a loan (debt), or a capital contribution. See Bronston v. Commissioner, T.C. Memo. 1975-5↩.
17. A debt arising out of a guarantee that has been performed is a "debt" under section 166. Horne v. Commissioner, 59 T.C. 319 (1972), affd. 523 F.2d 1363 (9th Cir. 1975), cert. denied 439 U.S. 892 (1978). See Casco Bank & Trust Co. v. United States, 544 F.2d 528 (1st Cir. 1976), cert. denied 430 U.S. 907 (1977); Nelson v. Commissioner, 281 F.2d 1↩ (5th Cir. 1960), affg. a Memorandum Opinion of this Court.
18. The $ 295,786 amount was calculated by subtracting $ 300,000 (the short-term capital loss) and $ 20,000 (Shelby's repayment to petitioner) from $ 615,786.↩
19. The $ 110,786 was calculated by subtracting the $ 20,000 repayment from the $ 130,786 total payments made directly to Shelby.↩
20. Although petitioner reported $ 37,500 interest income from Petro Site on his 1981 return, he failed to establish the source or reason for such payment, and whether it was related to the advances in issue.↩