### UNITED STATES of America, Plaintiff,

v.

### Warren F. YOUNG and Beverly A. Young, Defendants.

#### No. 83–C–609–B.

United States District Court,
N.D. Oklahoma.

Sept. 18, 1984.

---

William W. Guild, Rick K. Disney, Michael Gibson, Attys. Tax Division, Dept. of Justice, Dallas, Tex., for plaintiff.

Reece B. Morrell, Tulsa, Okl., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRETT, District Judge.

This case was tried to the Court sitting without a jury on August 8 and 9, 1984. It is a civil action brought by the United States of America against the defendants, Warren F. Young and Beverly A. Young, for unpaid assessments of federal income tax liabilities for the years 1972 through 1974, inclusive. After consideration of the evidence, the applicable legal authorities, and the arguments of counsel, the Court enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The defendants are residents of Tulsa, Oklahoma and are within the jurisdiction of this Court.

2. Warren Young is presently a practicing attorney at law and was so during the years in issue.

3. On August 15, 1968, Warren Young filed Articles of Incorporation with the Oklahoma Secretary of State's office for a corporation called Western Sanitation Company ("WSC"). WSC was a business formed by Warren Young and of which he was the principal owner, at the urging of one of his law business clients who owed him money, the purpose of which was to operate a residential and commercial refuse hauling business.

4. As part of the Articles of Incorporation, Warren Young signed an Affidavit as to Paid in Capital which swore that the amount of stated capital had been fully paid in.

5. Concerning WSC functioning as a corporation the evidence established the following:

A. No stock was ever actually issued to a stockholder and the $500.00 paid in capital, contrary to the affidavit of Warren F. Young, was not paid to the corporation. The bylaws were never signed by all of the directors of the corporation. The minutes of the first meeting of the shareholders and directors of WSC was only signed by Warren Young. Thereafter, no records of shareholders' or directors' meeting were maintained or kept.

B. WSC was operated for home office and accounting purposes out of the law office of Warren F. Young.[1] There was occasional commingling of funds between Mr. Young's law office account, personal account and that of WSC. Mr. Young's legal secretary kept the accounting records and performed the administrative tasks for WSC. WSC's only employees were individuals hired to drive WSC refuse collection trucks.

C. The annual city license for trash hauling was in the name of Warren F. Young, d/b/a Western Sanitation Company.

D. All operating capital was secured by Mr. Young and with him personally liable.

---

1. The decision to run a trash hauling business from one's law office has both ethical and practical considerations. Certainly it runs head on into the professional axiom, "the law is a jealous mistress." There is enough unwitting refuse in the law business that one should not wittingly increase its scope.

Initial assets were not actually transferred or conveyed to the corporation.

E. Western Sanitation Company filed federal corporate income tax returns for at least the years 1968, 1969, 1972, 1973 and 1974.

F. On November 16, 1970, Western Sanitation Company filed a Form 1139 Corporation Application for Tentative Refund From Carryback of Net Operating Loss and Unused Investment Credit.

G. Western Sanitation Company filed corporate employment tax returns on Forms 941 for at least the periods ended September 30, 1968; December 31, 1968; March 31, 1969; June 30, 1969; September 30, 1969; December 31, 1969; March 31, 1970; June 30, 1970; December 31, 1970; March 31, 1971; December 31, 1971; March 31, 1972; June 30, 1972; September 30, 1972; December 31, 1972; March 31, 1973; June 30, 1973; September 30, 1973; December 31, 1973; March 31, 1974; June 30, 1974; September 30, 1974; and December 31, 1974.

H. The Internal Revenue Service accepted all of these corporate tax returns.

I. On February 25, 1972, the Oklahoma Tax Commission entered its order directing the Secretary of State to enter of record the suspension of WSC's corporate charter and the forfeiture of all rights thereunder for failure to comply with the requirements of the Oklahoma Franchise Tax Act. On February 28, 1974, the Oklahoma Tax Commission entered an order directing reinstatement of WSC's charter.

6. For federal tax purposes the Court concludes WSC was a corporation incorporated under the laws of the State of Oklahoma.

7. During the calendar year 1974, Revenue Agent Arthur Hale ("Hale") came to defendant Warren F. Young's law office to audit defendants' tax return, Form 1040, for the calendar year 1971, and to secure returns for Western Sanitation Company and defendants' Forms 1040 which at that time were delinquent. Hale spent considerable time at Young's office until August 1975, assisting Young's employees with the preparation of WSC's tax forms and defendants' Forms 1040.

8. During the month of August, 1975, because defendants had not completed and filed WSC's returns FYE July 31, 1973 and FYE July 31, 1974, nor their Forms 1040 for the calendar years 1972, 1973 and 1974, Hale prepared returns for said periods pursuant to authority granted the Secretary under the Internal Revenue Code of 1954 ("Code"). Hale's returns reflected, *inter alia,* the following:

(i) <u>WSC's Forms 1120</u>:

| FYE: | 7/31/73 | 7/31/74 | |
|---|---|---|---|
| Taxable Income | $ 9,611.67 | [$ 62,075.00] | |

(ii) <u>Defendants' Forms 1040</u>:

| Calendar Years: | 1972 | 1973 | 1974 |
|---|---|---|---|
| Taxable Income: | $115,690.74 | $ 107,262.92 | $ 98,168.10 |
| Tax: | $ 48,830.37 | $ 44,804.46 | $ 40,436.85 |

9. WSC's returns prepared by Hale were signed by Hale and dated August 20, 1975. Defendants' returns prepared by Hale were signed by Hale and dated August 26, 1975.

10. Defendant Warren F. Young executed the return prepared by Hale for WSC's FYE July 31, 1974, and filed it on October 14, 1975. Defendant Warren F. Young did not execute the return prepared by Hale for WSC's FYE July 31, 1973, but executed and filed a return for that fiscal year on or about October 10, 1975, reporting a loss of $45,085.83, in contrast to Hale's return showing income of $9,611.67. Defendant Warren F. Young added the following note to the return he executed and filed FYE July 31, 1973:

"Prepared from best available information at this time but will probably be amended."

11. Before defendants were able to determine WSC's losses allowable for each Form 1040 year, Hale advised defendants that he had no choice but to file Forms 1040 he had prepared unless defendants filed returns for those periods prior to January 1, 1976. Defendants neither executed nor filed any of the Forms 1040 prepared for them by Revenue Agent Arthur Hale.

12. On December 23, 1975, defendants filed their 1972 income tax return. That return reflected a balance due the IRS of $3,508.

13. On December 23, 1975, defendants filed their 1973 income tax return. That return reflected a balance due the IRS of $11,522.

14. On December 23, 1975, defendants filed their 1974 income tax return. That return reflected a balance due of $11,608.

15. All three of these returns were delinquent at the time they were filed.

16. Based on the information contained in those original returns, a delegate of the Secretary of the Treasury made assessments against Mr. and Mrs. Young according to the following schedule:

| Tax Year | Date of Assessment | Type of Assessment | Amount of Assessment | Amount Unpaid |
|---|---|---|---|---|
| 1972 | 8/22/77 | Income Tax | $ 3,508.00 | - - |
| | | Delinquency Pen. | 627.00 | - - |
| | | Estimated Tax Pen. | 95.33 | - - |
| | | Failure to Pay Pen. | 564.30 | - - |
| | | Assessed Interest | 738.43 | $ 44.24 |
| | | | $ 5,533.06 | $ 44.24 |
| 1973 | 7/25/77 | Income Tax | $ 11,522.00 | $10,522.00 |
| | | Delinquency Pen. | 2,630.50 | 2,630.50 |
| | | Failure to Pay Pen. | 1,841.35 | 1,841.35 |
| | | Assessed Interest | 2,409.34 | 2,409.34 |
| | | | $ 18,403.19 | $17,403.19 |
| 1974 | 7/18/77 | Income Tax | $ 11,608.00 | $11,608.00 |
| | | Delinquency Pen. | 2,902.00 | 2,902.00 |
| | | Failure to Pay Pen. | 1,325.42 | 1,325.42 |
| | | Assessed Interest | 1,933.57 | 1,933.57 |
| | | | $ 17,768.99 | $17,768.99 |

17. After audit of defendants' returns for the years 1972 through 1974, the Internal Revenue Service sent a Notice of Deficiency to Mr. and Mrs. Young on June 26, 1978.

18. As a result of that audit, additional taxes were assessed against the defendants according to the following schedule:

| Tax Year | Date of Assessment | Type of Assessment | Amount of Assessment | Amount Unpaid |
|---|---|---|---|---|
| 1972 | 11/06/78 | Income Tax | $ 251.02 | $ 251.02 |
| | | Delinquency Pen. | 62.75 | 62.75 |
| | | Negligence Pen. | 187.95 | 187.95 |
| | | Assessed Interest | 93.17 | 93.17 |
| | | | $ 594.89 | $ 594.89 |
| 1973 | 11/06/78 | Income Tax | $ 4,515,58 | $ 4,515.58 |
| | | Delinquency Pen. | 1,129.00 | 1,129.00 |
| | | Negligence Pen. | 801.90 | 801.90 |
| | | Assessed Interest | 1,405.23 | 1,405.23 |
| | | | $ 7,851.71 | $ 7,851.71 |
| 1974 | 11/07/78 | Income Tax | $ 1,509.84 | $ 1,509.84 |
| | | Delinquency Pen. | 377.46 | 377.46 |
| | | Negligence Pen. | 655.89 | 655.89 |
| | | Assessed Interest | 379.27 | 379.27 |
| | | | $ 2,922.46 | $ 2,922.46 |

19. The defendants' 1971 tax return had been audited earlier and their 1971 taxable income had been increased. Defendants did not contest this adjustment.

20. The Internal Revenue Service adjustment to defendants' 1972 income tax liability related solely to the correction of a math error and the use of the corrected 1971 taxable income in defendants' 1972 Schedule G—Income Averaging.

21. The Internal Revenue Service adjustment to defendants' 1973 income tax liability related to two items: (1) The use of the corrected taxable incomes for 1971 and 1972 in defendants' 1973 Schedule G—Income Averaging; and (2) the disallowance of a claimed nonbusiness bad debt deduction to Western Sanitation Company in the amount of $20,784.74.

22. The Internal Revenue Service adjustments to defendants' 1974 income tax liability related to three items: (1) The use of the corrected taxable incomes for 1971, 1972 and 1973 in defendants' 1974 Schedule G—Income Averaging; (2) the disallowance of a claimed deduction for a nonbusiness bad debt to Western Sanitation Company in the amount of $12,733.96; and (3) the inclusion of an additional $1,000 in attorneys fees not reported on the original return.

23. On April 19, 1976, defendants filed an Amended Tax Return (Form 1040X) for 1972. On that return, defendants alleged that Western Sanitation Company was a sole proprietorship rather than a corporation. Therefore, defendants claimed that they were entitled to a Schedule C loss of $20,201 for 1972 resulting from the operation of Western Sanitation Company. Defendants claimed a resulting tax liability of $0 for 1972.

24. The Internal Revenue Service rejected this claim.

25. On June 22, 1976, defendants filed an Amended Tax Return (Form 1040X) for 1973. On that return, defendants alleged that Western Sanitation Company was a sole proprietorship rather than a corporation. Therefore, defendants claimed that they were entitled to a Schedule C loss of $52,188 resulting from the operation of Western Sanitation Company. They also claimed a casualty loss of $17,320 and an increase in their Schedule D income of $18,-911. Defendants claimed a resulting tax liability of $0 for 1973.

26. The Internal Revenue Service rejected this claim.

27. On July 2, 1976, defendants filed an Amended Tax Return (Form 1040X) for 1974. On that return, defendants alleged that Western Sanitation Company was a sole proprietorship rather than a corporation. Therefore, defendants claimed that

they were entitled to a Schedule C loss of $38,216 resulting from the operation of Western Sanitation Company. They also claimed an adjustment to their self-employment tax. Defendants claimed a resulting tax liability of $674 for 1974.

28. The Internal Revenue Service rejected this claim.

29. Defendants advanced funds either to, or on behalf of, WSC in at least the following amounts (in excess of repayments) for the years in question: $87,116.33 for 1972; $37,580.89 for 1973; and $37,713.88 for 1974. Most of these advances were in the form of checks written on the account of Warren F. Young, Attorney, and either payable to WSC or WSC's creditors. (The issue is whether these advances were capital contributions or some form of properly deductible expense of the defendants on their personal income tax returns).

30. Due to the poor financial condition of WSC, its liabilities considerably exceeding its assets, it was apparent to Mr. Young in 1971 and 1972, that the business could not be salvaged. In late 1971 WSC had in excess of $200,000 in liabilities, including notes payable to banks of approximately $170,000. Since Mr. Young's law practice was financed from the same principal source as WSC, the continued financial viability of Young's law practice was being threatened.

31. Starting in 1971 Mr. Young made numerous attempts to sell WSC at any price in order to get the buyer to assume WSC's debts.

32. Mr. Young was finally able to get rid of WSC in 1974. The only way he was able to get rid of the business was to let two trash haulers, who were making modest monthly salaries and who had questionable credit standing, take over the operations. Even then he had to go to the bank and borrow additional money to fix up the business before the trash haulers agreed to take over the operations.

33. The two trash haulers were supposed to assume the debt of WSC but the bank knew the two individuals could not afford to pay the liability and the bank continued to hold Mr. Young individually liable. When the two individuals did not pay on the debt, Mr. Young would go to the bank and make the payment. Mr. Young did not personally receive any money from the two trash haulers since the money was turned over to the bank to reduce the amount of the debt.

34. During this time period (late 1971 through 1974), Mr. Young was genuinely concerned that his reputation as an attorney would be adversely affected by either WSC's failure to pay its obligations, or his failure to stand good for the debts of WSC.

35. In Mr. Young's oil and gas law practice approximately three-fourths of his clientele and income was generated by two clients, Texaco, Inc. and Apache Oil Company. In his representation of these clients Mr. Young would purchase leases in his name for and on behalf of Texaco and/or Apache. Mr. Young would also perform the legal work in reference to the contracts, title search, and documents to consummate the transactions. Mr. Young would actually arrange financing for the leases through the bank he did business with, The First National Bank and Trust Company of Tulsa, Oklahoma. The financing of such mineral lease acquisitions in his name on behalf of Texaco and/or Apache ranged as high as $750,000. For Mr. Young to maintain and continue in his established oil and gas law practice, it was necessary for him to maintain a good credit rating because neither Texaco nor Apache would continue to employ him as an oil and gas attorney if he were unable to personally finance the lease acquisitions for and on behalf of his clients, Texaco and/or Apache.

36. Mr. Young made payments on behalf of WSC in order to preserve, protect, and continue his existing business as an oil and gas practicing attorney. The principal motivation of Young in making the payments on behalf of WSC in the years in question was not as a capital contribution or investment but essentially for the pur-

pose of protecting his personal credit rating to prevent the collapse of his oil and gas law practice and loss of his principal clientele. It was apparent to Mr. Young in making these advances he was not adding to the salable value of WSC, because he had known since approximately 1971 the business was, for all practical purposes without any equity value.

37. Under the facts of this case, the Court concludes that defendants can deduct said advances and expenditures as ordinary and necessary business expenses from their personal income tax returns for the years in question under § 162 of the Internal Revenue Code.

38. Defendants did not have any unpaid tax liability for the years 1972 through 1974 and they are entitled to a refund on the amounts already paid on these assessments.

39. Defendants did keep reasonable books and records as required by law and therefore were not negligent in failing to do so.

40. Any Conclusion of Law which might be properly characterized a Finding of Fact is hereby incorporated herein.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of the parties to this action.

2. The question of whether a corporation was formed in the first place is a question of local law. *Skarda v. Commissioner*, 27 T.C. 137, 144 (1956), *aff'd* 250 F.2d 429 (10th Cir.1957). However, whether the corporate entity (if found to exist) should be disregarded for federal tax purposes is a question of federal law. *Carver v. United States*, 412 F.2d 233 (Ct.Cl. 1969); *Stoody v. Commissioner*, 66 T.C. 710, 715 (1976).

3. A corporation is subject to federal corporate income tax liability as long as it continues to do business in a corporate manner, even if its recognized status under state law is terminated. *Messer v. Commissioner*, 438 F.2d 774 (3rd Cir.1971).

4. Since WSC did business as a corporation, and was held out by its principal owner and defendant, Warren F. Young, to the federal taxing authorities to be a corporation, for federal tax purposes it should be considered a corporate entity. *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943); *Crouch v. United States*, 692 F.2d 97 (10th Cir.1982).

5. A valid corporation will be disregarded for federal tax purposes only after the state has formally revoked a corporation's charter. *McDonnell v. Commissioner*, 34 T.C.M. (P–H) para. 65,125 (1965); *Wootan v. Commissioner*, 24 T.C.M. (P–H) para. 55,191 (1955).

6. Since the 1968 amendment to 18 Okl. St.Ann. § 1.198a (1983 Supp.) there is no automatic revocation of a corporate charter for failure to pay franchise taxes in Oklahoma. Present law provides for unlimited suspension with the corporation having the right to reinstate its charter at any time before the expiration of its Articles of Incorporation. *Simmons v. Alliance Corp.*, 79 F.R.D. 547, 548 (W.D.Okla.1978).

7. Although its charter was suspended from February of 1972 until it was reinstated in February of 1974, WSC was a corporation for federal tax purposes during calendar years 1972–1974.

8. Expenditures incurred by a taxpayer to protect or promote taxpayer's business or business reputation or to preserve, protect, and promote the credit and goodwill of taxpayer's business have been regarded as deductible. *Marks v. Commissioner*, 27 T.C. 464 (1956); *Max Lutz and Ruth Lutz v. Commissioner*, 282 F.2d 614 (5th Cir. 1960); *Harold L. and Temple M. Jenkins*, 52 T.C.M. (P–H) para. 83,667; *James O. Gould v. Commissioner*, 64 T.C. 132 (1975); *William A. Thompson, Jr. and Betty A. Thompson*, 52 T.C.M. (P–H) para. 83,487; *Samuel R. Milbank v. Commissioner*, 51 T.C. 805 (1969); *Cubbedge Snow v. Commissioner*, 31 T.C. 585 (1958); *Paul Draper v. Commissioner*, 26 T.C. 201

(1956); *William L. Butler v. Commissioner*, 17 T.C. 675.

9. A taxpayer may properly recognize a moral obligation in paying the debt of another. *Dunn & McCarthy, Inc. v. Commissioner*, 139 F.2d 242 (2nd Cir. 1943); *C. Doris H. Pepper v. Commissioner*, 36 T.C. 886 (1961). In this situation the jurisprudence does not require a precise similarity or strong connexity between the business benefited and the taxpayer making the payment. *Robert Garland, Inc.*, 41 B.T.A. 119 (1940); *Charles J. Dinardo v. Commissioner*, 22 T.C. 430 (1954); *Samuel R. Milbank v. Commissioner*, 51 T.C. 805 (1969).

10. Payments to protect a business often involve situations where the taxpayer's name, tradename, brand, patent, license or surname is involved. *Canton Cotton Mills*, 94 F.Supp. 561 (1951); *U.S. v. E.L. Bruce*, 180 F.2d 846 (6th Cir.1950); *James L. Lohrke v. Commissioner*, 48 T.C. 679 (1967); *L. Heller and Son v. Commissioner*, 12 T.C. 1109 (1949); *Joseph J. McGee v. Nee*, 113 F.2d 543 (8th Cir.1940).

11. The taxpayer sought to preserve, protect and promote defendant's established trade and business as an attorney and is entitled to a deduction under Section 162 of the Internal Revenue Code.

12. Any Conclusion of Law herein which might be properly characterized a Finding of Fact should be incorporated as a Finding of Fact.

13. In keeping with these Findings of Fact and Conclusions of Law and contemporaneous herewith a separate judgment should be entered entering judgment in favor of the defendants, Warren F. Young and Beverly A. Young, and against the plaintiff, the United States of America.