**In the Matter of FEDERATED DEPART-MENT STORES, INC., Allied Stores Corporation, et al., Debtors.**

**Bankruptcy No. 1–90–00130.**

United States Bankruptcy Court,
S.D. Ohio, W.D.

Jan. 8, 1992.

David Heiman, Jones, Day, Reavis & Pogue, John Zeiger, Carl M. Jenks, Jeffrey A. Lipps, Cleveland, Ohio, for plaintiff.

Gerald C. Miller, U.S. Dept. of Justice, Tax Div., D.P. Mullarkey, Douglas Snoeyenbos, Washington, D.C., for defendant.

FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW RE: DEBTORS' OBJECTION TO CLAIM OF INTERNAL REVENUE SERVICE (RE: WHITE KNIGHT BREAK–UP FEES)

J. VINCENT AUG, Jr., Bankruptcy Judge.

These Chapter 11 cases are before the Court pursuant to Debtors' ("Federated" and "Allied") Consolidated Objection to the Proofs of Claim of the Internal Revenue Service ("IRS"). This Consolidated Objection (Doc. 4988), filed by the Debtors on July 8, 1991, seeks, in part[1], a determination whether Debtors' payment of certain

---

1. The Consolidated Objection also raises the question of whether the use of Net Operating Losses in connection with Debtor Gold Circle's 1986 acquisition of the Twin Fair Stores in New York state was permissible. This question is addressed in a separate opinion and order.

fees associated with the failed merger attempts of Allied Stores Corporation and Federated Department Stores with, respectively, the Edward J. DeBartolo Corporation and R.H. Macy & Co., are deductible by the Debtors.

BACKGROUND

At the outset we note that a number of procedural motions were filed immediately prior to and during the hearings conducted on this matter on September 16, 17 and 18, 1991. While all of these motions were ruled on orally from the bench, we memorialize those rulings here.

First, by agreement of the parties these hearings were scheduled for September of 1991 in an attempt to allow both sides adequate discovery and preparation time. The Debtors developed their case within this time frame, but one week prior to trial, and citing denial of effective discovery in the case, the IRS sought a continuance. (*See*, Docs. 5733, 5734)

The Court reviewed the circumstances surrounding both the timing and the merits of this request and denied it on the basis that the parties had sufficient notice of the hearing date to complete their discovery in a timely manner, and that failure to do so was not justification for a continuance.

Second was the Debtors' Motion for an Order Admitting into Evidence Affidavit Testimony of Thomas M. Macioce. (Doc. 5738) The IRS objected to the admission of the affidavit (Doc. 5818) of the late Mr. Macioce on the grounds that the affidavit was not more probative on the point for which it was offered than other evidence the Debtors could have procured through reasonable efforts and that the interests of justice would not be served by the admission of the statement into evidence. The Court overruled the objection and ruled that the affidavit was admissible under Fed.R.Evid. 804(B)(1) and (B)(5).

Third was the question of whether the Court retained jurisdiction to hear the issues raised in regard to the deductibility of "white knight" break-up fees incurred in the Federated/Macy's attempted merger. A few days prior to the beginning of the hearings in this matter, the IRS filed an amended proof of claim which eliminated any claim for the tax year 1988–05. The IRS argued that as a result of certain settlement agreements with the Debtors, it had recomputed the Debtors' tax liabilities for several years, leading to a determination that for Federated's tax year ending May, 1988, the Debtors' liability was zero. Thus, according to the IRS, the Court no longer has jurisdiction to determine the allowability of the break-up fees deduction since the deduction can only affect the amount of the Debtors' net operating loss for that tax year, and that issue can only be raised in the context of a refund claim by Federated for an earlier tax year as to which Federated elects to carry back its 1988–05 net operating loss. The Court found this argument without merit and ruled that it retained jurisdiction to decide the matter on the basis that whether there was or was not a claim, there remained an issue with an immediate and substantial impact on the estate. If not litigated in conjunction with the Allied/DeBartolo break-up fee matter, this issue would have to be litigated separately some months down the road in the context of a request for refund. Thus, this Court retains jurisdiction. *See*, 11 U.S.C. § 505(a)(2)(B).

We would also note that Bankruptcy Rule 3006 prohibits a claimant from withdrawing its claim "except on order of the court after hearing on notice to" the Debtor and the relevant creditors' committees. The IRS did not seek court approval to withdraw its claim. Thus, its attempt to withdraw its claim for Federated's 88–05 tax year on the eve of trial and without court approval is void and of no effect. *See*, *In re Leonard*, 112 B.R. 67, 71, n. 10 (Bankr.D.Conn.1990). Given the importance of a timely resolution of this dispute to the success of the Debtors' ongoing reorganization efforts, the Court declines to grant leave to the IRS at this time to withdraw its claim relating to Federated's 1988–05 tax year.

The final preliminary matter was the issue of which party has the burden of proof in a claims objection hearing where the government is the claimant. Both parties

filed briefs in support of their positions and the matter was taken under submission.

## FINDINGS OF FACT

The facts surrounding both the attempted merger of Allied with the DeBartolo Corporation and of Federated with Macy's are not in dispute. The Debtors, in proposed Findings of Fact filed with this Court in Doc. 5954, have set forth in exhaustive detail the background of both transactions and of the ultimate takeover of both companies by the Campeau Corporation. The IRS filed no proposed findings, but set forth in summary form the facts essentially as outlined by the Debtors. (Doc. 6022) After careful review of the transcripts of the proceedings and of the voluminous exhibits admitted at trial, we are satisfied that the Findings of Fact as proposed by the Debtors accurately set forth the transactions as presented through both testimonial and documentary evidence. Accordingly, we hereby adopt as Findings of Fact those findings proposed by the Debtors.

In an effort to give some context to the following conclusions of law, however, we set forth an abridged version of the findings of fact:

### Allied/DeBartolo/Campeau Transaction

In 1986, Allied Stores Corporation was a large national department store chain whose business was performing well. Allied had no interest in or intention of being acquired. Among its assets were five valuable regional shopping centers, none of which was for sale.

In August of 1986, Robert Campeau, until then unknown to the management of Allied, approached the company and expressed his interest in having Campeau Corporation acquire Allied. Allied believed Campeau's real interest was in buying the five regional shopping centers and accordingly, discussed this possibility with Campeau. Campeau offered $300 million for the five centers. Allied dismissed this offer as too low.

On September 4, 1986, Campeau sent an unsolicited proposal to Allied to acquire control of 55% of Allied for $58 per share. Campeau's offer required a response by Allied by September 11. On September 6, Allied retained Goldman, Sachs & Co. as a financial advisor to assist Allied in its formulation of a defensive response to the Campeau proposal.

Allied's Board of Directors met on September 11 and, after a presentation by Goldman, Sachs, decided against engaging in merger discussions with Campeau. The Board expressed its concern about the level of debt needed to finance the acquisition, disruption of Allied's business as a result of an acquisition, and concern about Campeau's financing and inexperience in the retailing field.

The next day, a subsidiary of Campeau commenced an unsolicited hostile tender offer for Allied. The tender offer was structured in two tiers: $58 per share for roughly 55% of Allied's stock ($1.79 billion), and securities, cash or some combination thereof for the balance of the shares. This two-tiered approach is generally used to coerce shareholders into tendering their shares early. This tender offer was to close on October 9.

The Allied Board met on September 23 to consider its response to the tender offer. At that meeting, Goldman, Sachs reported to the Board on relevant financial data, possible alternative merger candidates, and a possible recapitalization plan. Goldman, Sachs also advised the Board that $58 per share was inadequate value. The Board recommended that shareholders reject the Campeau offer and not tender their shares. The Board further resolved that Allied should investigate alternative defensive measures to block the Campeau hostile offer, and as a result, decided to explore recapitalization plans, asset sales, corporate acquisitions, leveraged buyouts, and white knight mergers.

Allied also explored a "crown jewel" defense, in which Allied would sell the five regional shopping centers, thus making Allied less attractive to Campeau. Allied's management met with the Edward J. DeBartolo Corporation to discuss this possibility. An agreement was reached whereby Allied would sell the five centers to DeBartolo for $405 million.

On September 29, 1986, Campeau amended its two-tiered offer by increasing the offer price to $66 per share in cash and raising the number of shares to be purchased to approximately 80% of those outstanding. Again, a combination of securities and cash was offered for the remaining shares. This offer was open until October 10, 1986. Allied was unable to finalize a recapitalization plan prior to the expiration of the new offer, and feared its shareholders would tender their shares to Campeau.

In the wake of the amended Campeau offer, Allied began negotiating a possible merger with DeBartolo in what is known as a "white knight" transaction, in which DeBartolo would rescue Allied from a takeover by Campeau. By October 3, Allied and DeBartolo had reached a definitive Agreement and Plan of Merger under which DeBartolo would acquire Allied for $67 cash per share for all outstanding shares.

As a precondition for its agreement to enter into the merger, DeBartolo demanded "break-up" protections in the event the merger failed for certain specified reasons including mutual decisions by the Boards of both companies to terminate the merger agreement. These protections included a $1.00 per share fee and all out-of-pocket expenses. Allied's obligation to pay these fees is set forth in § 8.3 of the DeBartolo Merger Agreement. DeBartolo insisted that an escrow be established to secure payment of these fees.

Testimony elicited at the hearing indicated that break-up fees are ordinary and customary provisions demanded by white knights as a condition to an agreement to acquire a company. These fees reimburse the white knight for monies spent to arrange financing, retain counsel and investment banking assistance, pay commitment fees and cover other substantial costs and expenses incurred in responding quickly in a hostile takeover situation. These fees act not only to compensate a company should the merger fail, but also make the target company less attractive to the hostile suitor since the value of the company is reduced by the amount of the break-up fees.

On October 3, the Allied Board met to consider the DeBartolo merger proposal and the Campeau amended offer. The Board approved the proposed merger with DeBartolo and recommended it for acceptance by the shareholders. In the Board's view, the DeBartolo proposal was superior in that it was fully financed and the price per share was fair and adequate. The DeBartolo Merger Agreement was executed on October 7, 1986. By entering into this Agreement, Allied did not intend to solicit or encourage other bids by Campeau or any other entity or to facilitate any type of takeover by Campeau.

On October 8, 1986, DeBartolo commenced a fully-financed, all-cash offer for all the outstanding shares of Allied at $67 per share. On the same day, the Allied Board approved the offer and recommended it for acceptance by shareholders. The offer was scheduled to close on November 6, 1986. On October 9, Allied deposited in excess of $105 million into escrow with Manufacturers Hanover Trust Company to cover the amount of potential break-up fees as estimated by DeBartolo.

On October 10, the Allied Board adopted a shareholder rights plan intended to neutralize the timing advantage of Campeau's tender offer. Campeau immediately filed suit in federal District Court to enjoin the enforcement of the shareholder rights plan. On October 23, the District Court denied Campeau's request for an injunction and upheld the validity of the shareholder rights plan.

On October 24, Campeau terminated its tender offer and bought approximately 48% of Allied's shares from Jeffries & Company, an arbitrage firm, for $67 per share. This block of shares, along with the 4% already owned by Campeau, gave Campeau direct control of more than a majority of Allied Shares. This control would have rendered the completion of the DeBartolo merger a practical impossibility. Campeau sent a letter to Allied the same day purporting to discharge the members of Allied's Board and nullify the break-up fee commitments in the DeBartolo Merger Agreement. Allied and DeBartolo respond-

ed with a lawsuit in District Court to enjoin Campeau from exercising control of Allied pending further proceedings. The District Court issued a temporary restraining order to that effect.

On October 30 and 31, Campeau offered to acquire the remaining 48% of Allied's shares for $69 per share. Allied's Board attempted to negotiate with DeBartolo for an offer that would better the Campeau offer. These negotiations were unsuccessful and the Allied Board ultimately recommended acceptance of Campeau's offer and authorized a merger agreement with Campeau and a tripartite settlement agreement with Campeau and DeBartolo.

The tripartite settlement agreement terminated the DeBartolo Merger Agreement by mutual consent of the Allied and DeBartolo Boards of Directors. This termination resulted in the abandonment of the merger transaction between Allied and DeBartolo.

DeBartolo was paid $116,298,236 in break-up fees by Allied. This payment was made in two installments on November 3 and 4, 1986. Allied was not compensated for these payments by insurance or otherwise. Allied deducted these payments on its federal corporate income tax return for the taxable year ending December 31, 1986.

It is without dispute that Campeau's attempt to acquire Allied was hostile from the outset and continued to be hostile in nature until October 30, 1986, when negotiations commenced between Allied and Campeau that led to Campeau's acquisition of Allied. Allied engaged in a number of defensive maneuvers to frustrate the takeover attempt and Allied's Board acted in a manner consistent with its fiduciary duty to act in the best interests of Allied and its shareholders. Testimony adduced at the hearing by former members of Allied's Board indicated that the Board's concern was not only in the price per share to be gleaned from an acquisition but in the long-term stability of a well-respected and well-run corporation. The Board never concluded that the Campeau acquisition would yield long-term benefits for Allied and its shareholders.

*Federated/Macy/Campeau Transaction*

The 1988 takeover of Federated Department Stores, Inc. and its affiliates by the Campeau Corporation contained many of the same elements and had the same flavor as the Campeau takeover of Allied.

In 1988, Federated was the largest department store chain in the United States and contained many of the most well-known names in retailing: Abraham & Straus, Bloomingdale's, Rich's, Bullock's, I. Magnin and Lazarus. In addition, Federated operated Ralph's Grocery and other discount and specialty stores. Federated was performing well, had developed a long-range business plan, and had no intention of selling or being acquired. In fact, to avoid any hostile takeover bid, Federated had adopted certain defensive measures such as staggered terms for its Directors and a shareholder rights plan.

In January of 1988, Federated management became aware of rumors that Campeau might attempt a takeover. Federated's management was aware of Campeau's takeover of Allied and the subsequent dismantling of Allied's empire, and in general did not have high regard for Campeau's retailing acumen.

On January 25, 1988, a subsidiary of Campeau unleashed an unsolicited hostile tender offer for all of Federated's shares at $47 cash per share. The offer was contingent upon financing and was scheduled to close on February 22, 1988. Campeau also initiated a lawsuit in federal court to enjoin the enforcement of Federated's shareholder rights plan.

Federated's Board of Directors met January 28 to review the Campeau offer and review the alternative defensive strategies available. The Board appointed a special sub-committee to deal with the Campeau offer and also authorized the retention of an investment banking firm. On February 4, the Board met again and determined that the Campeau price was too low and that the financing contingency was too speculative. In addition, Federated's Board felt Campeau was an undesirable acquiror given its performance with Allied. The Board

thus recommended that the shareholders reject the Campeau offer.

Over the next month, Federated pursued white knight merger discussions with the May Company, Dayton Hudson, Dillard's and The Limited. Draft merger agreements were received from the May Company and Dillard's and both contained break-up fee provisions. Both companies eventually withdrew their proposals.

Federated also pursued other defensive options, including a recapitalization plan. On February 16, Federated's Board authorized management to incur up to $5 million in fees to secure up to $500 million in financing commitments for use in a restructuring. By February 24, Federated had obtained commitments for 100% of the senior bank financing needed for the proposed restructuring.

Federated also considered the purchase of a significant block of stock by JMB Realty as a "white squire" defensive mechanism, and considered the possibility of a leveraged buyout by Federated management.

On February 29, R.H. Macy & Company offered to buy approximately 80% of Federated's shares at $73.80 cash per share, with the remaining shares being exchanged for stock in the new merged entity. Macy's proposal was conditioned on reimbursement by Federated of all of Macy's expenses up to $45 million plus a "topping fee" of 100% of any excess consideration Federated's shareholders would receive should another acquiror be successful.

Federated reached a definitive Agreement and Plan of Merger with Macy on February 29, 1988. As part of the Agreement, Macy raised its offer to $74.50 cash per share for 80% of Federated's stock. The Agreement required payment of up to $45 million to Macy for its expenses but reduced the "topping fee" to 25%. These break-up fee provisions were found at § 8.03 of the Macy Merger Agreement and were intended to protect Macy's investment should it ultimately fail to acquire Federated, regardless of the reason for the failure, so long as Macy did not breach the Agreement or fail to obtain financing. As in the Allied situation, these break-up fees had the effect of making any other offer for Federated more expensive and thus less likely to occur.

On March 1, 1988, the Federated Board met and concluded that the Macy offer was fair and adequate and was superior to the Campeau offer, since Campeau's financing was still uncertain and since Macy's history as a long-time successful retailer was a better match for Federated. The Board recommended the Macy plan for acceptance by its shareholders and rejected the Campeau plan.

The Macy Merger Agreement was executed on March 2, 1988 and was publicly announced in a joint press release. Federated's Board believed the merger with Macy would be successfully completed and that the break-up fees would never have to be paid. Federated did not intend to solicit or encourage any further transactions or bids with Campeau or any other party.

On March 7, 1988, Campeau amended its hostile tender offer to $75 cash per share for 80% of shares and $44 cash per share for the remaining shares. At the same time it announced a legal challenge to the break-up fees. On March 8, Macy commenced its tender offer at its originally announced price of $74.50 cash per share for 80% of the shares and stub equity in the new merged company for the balance. Federated approved the Macy tender offer that same day and recommended it for acceptance by its shareholders.

Because the Campeau offer expired on March 15 and the Macy offer was open until April 4, Macy agreed to amend its tender offer to provide an additional $200 million in cash for the front-end shares in exchange for an Asset Option Agreement that granted Macy an option to purchase Bullock's and I. Magnin from Federated in the event that someone other than Macy were to acquire Federated. On March 15, Macy amended its tender offer to $77.35 cash per share, while lowering the back-end stub equity value to 36% of the stock in the merged company.

On March 18, the District Court refused to grant Campeau's application to enjoin Federated's shareholder rights plan or the break-up fee commitments. The Court also extended the Campeau offer to March 25, 1988.

On March 29, 1988, Federated sent a letter to Campeau and Macy proposing procedures for an orderly auction. In that letter, Federated recognized Macy's rights under § 8.03 of the Macy Merger Agreement and under the Asset Option Agreement. Campeau rejected the auction procedures, as did Macy unless the cap on expense reimbursement were to be raised from $45 million to $90 million. As a result, there was no auction of Federated.

On March 31, and without any prior knowledge of or involvement by Federated, representatives of Macy and Campeau met privately and negotiated a withdrawal of Macy's tender offer on the condition that Campeau would ensure that Federated honor its break-up fee commitments by paying Macy $60 million in documented expenses incurred in connection with the attempted merger and tender offer.

The Federated Board met on April 1, 1988 and was informed that Campeau and Macy had reached an agreement between themselves and that the only remaining offer was Campeau's for $73.50 cash per share for all shares. The Board then approved the execution of a merger agreement with Campeau and the execution of a tripartite settlement agreement among Federated, Campeau and Macy.

The tripartite settlement agreement acknowledged the termination of the Macy Merger Agreement by mutual consent of the Macy and Federated Boards of Directors and also acknowledged the termination of the Asset Option Agreement. The termination of the Macy Merger Agreement resulted in an abandonment of the merger transaction between Macy and Federated. Paragraph 11 of the tripartite settlement agreement provided that Federated pay Macy $60 million for reimbursement of documented expenses incurred by Macy in connection with the Macy Merger Agreement, Macy tender offer and related matters. On May 3, 1988, Federated paid Macy the $60 million. Federated was not compensated for this payment by insurance or otherwise.

The Federated Board never concluded that an acquisition by Campeau would yield any long-term benefits for Campeau. The break-up fees paid by Federated to Macy were incurred in connection with a merger that was actively pursued throughout March of 1988 and that was intended as a defensive move against Campeau's takeover attempt. Campeau's attempt to acquire Federated was hostile from its inception and was met by a Board that took every action possible to meet its fiduciary obligations to both Federated and its shareholders not only to achieve the highest per share price possible, but to ensure the long-term stability of the corporation. There is no evidence that Federated intended or expected any time prior to March 29, 1988 that it would be acquired by Campeau or any party other than Macy.

CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter pursuant to 11 U.S.C. §§ 502(b) and 505(a), 28 U.S.C. §§ 157(b) and 1334(b), and the General Order of Reference entered in this District. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). As noted above, the Court denies Claimant's motion, made at the outset of trial, to dismiss the Federated portion of this matter for lack of subject matter jurisdiction.

2. Venue is proper under 28 U.S.C. § 1409.

■ 3. The IRS has the burden of persuasion on each of its claims. The IRS asserts that the same burden of proof standards that apply in non-bankruptcy tax litigation should apply in bankruptcy so that the Debtors, as taxpayers, bear the ultimate burden of persuasion. The Debtors argue that there is no statutory or policy justification for exempting the IRS from the general rule in bankruptcy that the claimant always bears the ultimate burden of persuasion on the validity of its claim.

■ A proof of claim or interest is *prima facie* evidence of the claim or inter-

est. 11 U.S.C. § 502(a); Bankr.R. 3001(f). It is allowed, as filed, unless a party in interest objects. 11 U.S.C. § 502(a). Once an objection is filed, however, the presumption of validity may be rebutted by the objecting party. Once rebutted, the claimant carries the burden of establishing the validity of its claim by a preponderance of the evidence. Traditionally, in tax litigation the taxpayer has had the burden of proof as to the propriety of its position. In bankruptcy, however, there has been a split among courts as to whether the taxpayer/debtor should carry the burden, as in tax litigation, or whether the IRS/creditor should. This Court finds that the better reasoned cases are those that treat the government as any other creditor in bankruptcy, and accordingly, place the burden on the IRS to establish its claim. *In re Fidelity Holding Co., Ltd.,* 837 F.2d 696, 698 (5th Cir.1988); *In re Eversole,* 1990 Bankr. LEXIS 1859 (Bankr.S.D.Ohio, Aug. 13, 1990); *In re Butcher,* 100 B.R. 363, 367 (Bankr.E.D.Tenn.1989); *In re Unimet Corp.,* 74 B.R. 156, 166 (Bankr.N.D.Ohio 1987). These decisions hold that the government must be treated like any other claimant in bankruptcy court and is not entitled to any special exception.

To hold otherwise here would work a grave injustice on the Debtors. The IRS filed claims based upon determinations of deficiencies. The Debtors objected to the claims. The IRS filed an abbreviated response that failed to set forth in any manner the basis or bases of its claims. (Doc. 5279) The Debtors filed a trial brief (Doc. 5816) setting forth their legal and factual arguments in support of the deductibility of the break-up fees. The IRS filed no pretrial statement of any kind. As of the morning of the commencement of the hearing, the IRS still had not divulged the theory of its case or the bases of its claims. During opening remarks, the IRS stated that it did not view this as a factual dispute, and that it planned to call no fact witnesses. It was only during opening remarks that this Court and the Debtors learned of the IRS theory of the case. To place the ultimate burden on the Debtors under such circumstances would be unconscionable. Because of the uncertainty of the IRS' position, however, the Debtors proceeded throughout as if they carried the burden. *See, In re Premo,* 116 B.R. 515, 524 (Bankr.E.D.Mich.1990) (endorsing this approach).

4. The Debtors have advanced two theories under which their deduction of the breakup fees is allowable. The first is that the fees are deductible under 26 U.S.C. § 165(a) as costs incurred in connection with an abandoned transaction. The second is that the fees are deductible as ordinary and necessary business expenses under 26 U.S.C. § 162. The Debtors proceeded throughout the hearing to try this matter as if they carried the burden of persuasion under both theories. Given the overwhelming weight of the evidence set forth by the Debtors and the lack of any counterbalancing evidence by the IRS, the Court finds that IRS has failed to meet its burden of disproving the validity of the claimed deductions, and thus establishing its claims, under either theory. The Debtors are entitled to deduct the break-up fees paid to DeBartolo and Macy, respectively, in the 1986–12 and 1988–05 tax years.

*Section 165(a) Analysis*

5. The break-up fees constitute costs not compensated by insurance or other reimbursement that were incurred in connection with an abandoned transaction. Such costs are deductible under 26 U.S.C. § 165(a). Section 165(a) permits the current deduction of any "loss sustained during the taxable year and not compensated for by insurance or otherwise."

Section 8.3 of the DeBartolo Merger Agreement imposed a binding contractual obligation on Allied, as of October 7, 1986, to pay break-up fees to DeBartolo if the merger were terminated by agreement of the parties. There is no dispute that the DeBartolo Merger Agreement was, in fact, terminated by mutual consent on October 31, 1986, and that Allied's pre-existing contractual obligation to pay the break-up fees to DeBartolo was triggered. It is without question that the DeBartolo merger never occurred and that the break-up fees were paid by Allied to DeBartolo only when the

merger failed. Thus, these were costs incurred in connection with an abandoned transaction. Accordingly, the payments made during Allied's tax year ended December 31, 1986, which totaled $116,298,-236, and which were not compensated for by insurance or otherwise, are costs that Allied properly deducted as abandonment losses under 26 U.S.C. § 165(a) in that tax year.

Likewise, section 8.03 of the Macy Merger Agreement imposed a binding contractual obligation on Federated, as of March 2, 1988, to pay break-up fees to Macy if the merger were terminated by agreement of the parties. There is no question that the Macy Merger Agreement was, in fact, terminated by mutual consent on April 1, 1988, thereby triggering Federated's pre-existing contractual obligation to pay the break-up fees to Macy. Again, it is beyond dispute that the Macy Merger never occurred and was ultimately abandoned. The break-up fees Federated paid to Macy were paid only when the merger failed, and thus, were incurred in connection with an abandoned merger transaction. This being true, the payments made during Federated's tax year ended May 3, 1988, which totaled $60,000,000, and which were not compensated for by insurance or otherwise, are costs that are properly deductible by Federated as abandonment losses under 26 U.S.C. § 165(a) in that tax year.

Section 165(a) has been construed to permit deductions for costs associated with specific transactions that are first pursued then later abandoned. *See, e.g., Sibley, Lindsay & Curr Co. v. Comm'r,* 15 T.C. 106 (1950), *acq.* 1951–1 C.B. 3; *Tobacco Products Export Corp. v. Comm'r,* 18 T.C. 1100 (1952). These principles have been applied even though the abandoned transaction, if consummated, would be a capital transaction and the associated costs would have to be capitalized. *See, e.g., Doernbecher Mfg. Co. v. Comm'r,* 30 B.T.A. 973 (1934), *acq.* XIII–2 C.B. 6, *aff'd on other grounds,* 80 F.2d 573 (9th Cir.1935) (holding that even if some of the information gathered in an investigation of merger possibilities was availed of in a later merger, the deduction could not be disallowed since the evidence showed that the taxpayer was not a party to the merger for which the investigation was done and for which the expenses were incurred.)

Under its § 165 analysis, the IRS argues that the cost of terminating a contract which is capital in nature, in order to enter into another capital contract, is a capital expenditure of the accepted contract, and does not constitute an abandonment. The IRS cites three cases in support of its position: *Darlington–Hartsville Coca–Cola Bottling Co. v. U.S.,* 273 F.Supp. 229 (D.S.C.1967), *aff'd,* 393 F.2d 494, 496 (4th Cir.1968), *cert. denied,* 393 U.S. 962, 89 S.Ct. 402, 21 L.Ed.2d 376 (1968); *Peerless Weighing and Vending Machine Corp. v. U.S.,* 52 T.C. 850 (1969); and *Rodeway Inns of Am. v. Comm'r,* 63 T.C. 414, 419–20 (1974). In all three cases, which were cases under § 162, not § 165, the taxpayer caused the termination of an existing contract or lease and paid a price to the other party in order to secure the termination, which in each case allowed the taxpayer to enjoy a more beneficial arrangement. In *Darlington, supra,* the Fourth Circuit defined a capital expenditure as one intended "to produce a positive business benefit whose effect will be reaped in seasons beyond a single year." 393 F.2d at 494.

This is not the case before us. In light of the overwhelming testimonial and documentary evidence presented, the IRS cannot seriously argue that the Debtors here voluntarily terminated their merger agreements with DeBartolo and Macy in order to pursue a more advantageous relationship with Campeau. The uncontroverted evidence is that both Debtors fought tooth and nail to prevent the consummation of mergers with Campeau. Only when DeBartolo could no longer better the Campeau offer did Allied reluctantly agree to the Campeau merger. The merger agreement between Macy and Federated was terminated after private negotiations between Macy and Campeau removed Macy as a contender.

Equally clear is that the IRS cannot seriously argue, nor has it offered any evidence to establish, that the transactions

with DeBartolo and Macy produced any positive and lasting business benefit.

In further support of its argument that the break-up fees are not deductible under § 165, the IRS takes the position that both Boards' ongoing determination to obtain the greatest value for shareholders was ultimately successful, and thus the capital restructuring was never abandoned. This theory is seriously flawed, both legally and factually.

6. As noted above, both Courts and the Internal Revenue Service itself have long held that costs related to a specific capital transaction are deductible when that specific transaction is abandoned. *See, e.g., Doernbecher; Sibley, Lindsay & Curr; Tobacco Products, supra; Portland Furniture Mfg. Co. v. Comm'r*, 30 B.T.A. 878 (1934), *non-acq.* XIII-2 C.B. 33. It is without dispute that the specific mergers with DeBartolo and Macy did not materialize, and Debtors paid the agreed-upon price when they failed. Neither Allied nor Federated paid the fees to facilitate a "sweeter deal" with Campeau as the IRS would have it. The fact that Campeau eventually effectuated the mergers at a higher per share price that initially offered is irrelevant to the analysis. The facts remain that the specific DeBartolo and Macy mergers failed, were abandoned and were of no benefit to the Debtors. Payments of the break-up fees in connection with these failed transactions were not compensated and accordingly, these fees are deductible under § 165.

Further, as a parade of witnesses compellingly testified, and as scores of Board meeting minutes attest, the goal of the Boards was never limited to goading up the price of the stock. Both of these companies were established retail giants with thousands of employees and suppliers and untold thousands of customers. Their Boards were comprised of talented and thoughtful business leaders who were aware of their fiduciary duty not only to their shareholders, but to their broader-based "stakeholders." As hindsight has demonstrated graphically by way of these Chapter 11 proceedings, the Boards had good reason to be wary of Mr. Campeau's intentions. To dismiss the actions taken during the chaotic and clearly draining months of the takeover battles as merely devices to drive up the price of stock would be to ignore the uncontroverted evidence that neither Allied nor Federated sought or welcomed these restructurings.

7. Furthermore, if as the IRS urges, expenses incurred in hostile takeover battles are to be capitalized rather than deducted if they result in a future benefit, we find, obviously, that the failed mergers with Macy and DeBartolo and the ultimate takeovers by Campeau were not beneficial in any common sense of the word.

8. In sum, the payment of these fees falls plainly within the language of § 165 and, apparently, within the IRS' long-established practice. *See*, General Counsel Memorandum 39352 (April 12, 1985); Tech. Adv.Mem. 8516002 (Dec. 14, 1984) (revoked by Tech.Adv.Mem. 8626001 (Aug. 23, 1985) and reinstated by Tech.Adv.Mem. 8816005 (Feb. 13, 1987)).[2] Thus, the fees are deductible as losses from abandoned transactions under § 165.

*Section 162(a) Analysis*

■ 9. Section 162(a) of the Internal Revenue Code allows a deduction for "all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business ..." To be deductible under Section 162, "an item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." *Commissioner v. Lincoln Savs. & Loan Ass'n*, 403 U.S. 345, 352, 91 S.Ct. 1893, 1898, 29 L.Ed.2d 519

**2.** The IRS made much of the impropriety of citing to a Technical Advice Memorandum as precedent. The Court specifically asked the IRS to address the issue of the basis for the apparent change in the IRS position regarding the deductibility of expenses incurred in connection with abandoned capital transactions. *See,* Transcript of Proceedings, Sept. 17, 1991, p. 222–224. No explanation was forthcoming and the Court confesses some degree of astonishment at the IRS' insistence that we cannot look to prior IRS conduct in this matter.

(1971). The expenses at issue here easily meet the first three criteria.

10. To achieve the deduction, however, the taxpayer must also satisfy both the "ordinary" and the "necessary" tests. "The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle." *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933).

■ In its § 162 analysis, the IRS again argues that these expenses are capital in nature and points out that a capital expense differs primarily from a deductible expense under section 162(a) in that, rather than maintaining property in its current state, the expense adds to value or prolongs the life of the property. *See, Louisville & Nashville R.R. Co. v. C.I.R.,* 641 F.2d 435, 439–40 (6th Cir.1981). An expense must be capitalized when it is directly related to a capital transaction or serves to create or enhance a distinct additional asset. *Lincoln, supra,* 403 U.S. at 354, 91 S.Ct. at 1899. *See also, Third Nat'l Bank in Nashville v. United States,* 427 F.2d 343 (6th Cir.1970) (costs of disposing of securities is a capital expenditure).

The Debtors argue here that the break-up fees are deductible as ordinary and necessary business expenses, and rely on *Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933) for the proposition that the costs are "necessary" if they are, in the business judgment of the taxpayer, "appropriate and helpful," 290 U.S. at 113, 54 S.Ct. at 9, and they may be "ordinary" even if incurred rarely, depending on the context in which incurred. "Now what is ordinary, though there must always be a strain of constancy within it, is nonetheless a variable affected by time and place and circumstance." *Id.* at 113–114, 54 S.Ct. at 9.

11. Costs incurred to defend a business against attack have been considered ordinary and necessary business expenses, and thus fully deductible under section 162, under a long line of decisions. *See, e.g. NCNB Corp. v. United States,* 684 F.2d 285, 290 (4th Cir.1982) and cases cited therein, (this holding is a "long recognized principle of tax law"); *A. Harris & Co. v. Lucas,* 48 F.2d 187, 189 (5th Cir.1931); *United States v. Young,* 604 F.Supp. 164, 170 (N.D.Okla.1984); *L. Heller & Son, Inc. v. Comm'r.,* 12 T.C. 1109, 1112 (1949); *Kornhauser v. U.S.,* 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505 (1928) ("petitioner did not voluntarily make this expenditure as an investment for the purpose of acquiring any property, but involuntarily in defense of a spurious claim for an accounting. The amount so expended was a total loss, the antithesis of an investment, and it cannot be recovered, nor was the petitioner compensated therefor by insurance or otherwise." *Id.* at 146.)

12. The evidence adduced at trial confirmed that the Debtors engaged in protracted and strenuous defensive tactics when faced, involuntarily, with the threat of Campeau's hostile acquisitions. Furthermore, the decision to engage in a "white knight" defense was an established, common and accepted defensive move, and thus would be considered "ordinary" in the context of a hostile takeover battle. The expenses incurred in the "white knight" defense were "necessary" in the sense that the Boards of both Allied and Federated were committed to thwarting Campeau and both DeBartolo and Macy required the protections of a contractual "break-up fee" in the event they were, themselves, thwarted. Accordingly, the break-up fees paid to De-Bartolo and Macy in the tax years 1986–12 and 1988–05 are deductible as ordinary and necessary business expenses under § 162.

*National Starch Analysis*

13. Finally, we would note that the recent case of *National Starch and Chemical Corp. v. Comm'r,* 93 T.C. 67 (1989), *aff'd* 918 F.2d 426 (3rd Cir.1990), *cert. granted sub nom. INDOPCO, Inc. v. Comm'r,* — U.S. ——, 111 S.Ct. 2008, 114 L.Ed.2d 96 (1991),[3] is inapplicable under the

---

**3.** We note that the recent arguments in the Supreme Court on the INDOPCO case addressed a number of questions on the current deducti-

bility of takeover expenses (*see,* 60 U.S.L.W. 3386–87, November 26, 1991), particularly the recent change in the IRS' position. Presumably

facts since *National Starch* dealt with the denial of deductibility of expenses incurred in a *successful friendly* takeover. Both the Tax Court and the Third Circuit stressed that the acquisition led to a long-term future benefit for the company that would have to be capitalized rather than currently deducted. As pointed out above, the DeBartolo and Macy mergers never materialized, and thus conferred no benefit, and the Campeau mergers resulted in the very antithesis of long-term future benefit.

CONCLUSION

The Court concludes that the IRS has failed to carry its burden of persuasion with respect to its proofs of claim. Further, the Court concludes that the Debtors, who tried this matter as if they bore the burden of persuasion, have carried their burden overwhelmingly with respect to the facts from which this Court's legal conclusions follow.

Accordingly, the IRS' proofs of claim with regard to the determination of non-deductibility of the break-up fees paid to DeBartolo and Macy are DISALLOWED and the Debtors' objections to those claims are GRANTED.

IT IS SO ORDERED.

parties and courts dealing with the aftermath of the 1980's takeover frenzy will soon have guid- ance in this area.